## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:17-cv-62100-MORENO/SELTZER

KATIRIA RAMOS,
individually and on behalf of all
others similarly situated,

       Plaintiff,

v.

HOPELE OF FORT LAUDERDALE, LLC
d/b/a PANDORA @ GALLERIA,
a Florida limited liability company, and
PANDORA JEWELRY, LLC, a Maryland
limited liability company,

       Defendants.

_____/

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## HOPELE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Katiria Ramos, pursuant to Federal Rule of Civil Procedure 56, responds in opposition to Defendant Hopele of Fort Lauderdale, LLC's ("Hopele") Motion for Summary Judgment ("Motion"), [ECF No. 62], and states:

## I.   INTRODUCTION

Having violated the TCPA over ▮▮▮▮ times, Hopele remains unapologetic, attacking Plaintiff for enforcing her federally protected privacy rights, and the undersigned for seeking to protect the thousands of consumers who were harmed by Hopele's unlawful conduct.  Hopele's Motion is symbolic of the overall defense strategy it has adopted in this case.  Rather than accept liability and make consumers whole for the harm it has caused, Hopele has doubled down by misconstruing the facts and asserting meritless arguments.  Hopele's Motion must be denied for the following reasons.

First, the EZ-Texting platform – used by Hopele to violate the privacy rights of Plaintiff and over ▮▮▮▮ Class Members – is an ATDS under the plain language of the statute and the FCC's 2003 TCPA Order.  As established by the unrebutted report of Plaintiff's expert, Randall Snyder, the EZ-Texting platform has the *capacity* to store telephone numbers using a random or sequential generator, and to dial such numbers.  The EZ-Texting platform also has the *capacity* to dial numbers from a list without human intervention.  Notably, and fatal to Hopele, the Motion is silent on whether the EZ-Texting platform has the *capacity* to dial numbers from a list without human intervention.  This is likely because the EZ-Texting platform in fact, has the *capacity* to store telephone numbers and dial such numbers automatically.

Second, Hopele's human intervention argument misleadingly focuses on every step of the process that resulted in transmission of the text messages, and disregards the only step that matters: the *dialing* of the calls.  It is undisputed that that the *dialing* of over ▮▮▮▮ text messages occurred *en masse* without any human intervention.  Indeed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The FCC's 2003 TCPA Order – and cases correctly applying the order – all make clear that the focus of the analysis is whether a human was involved in the *dialing* of the telephone numbers.  Here, there is no dispute that the EZ-Texting platform dialed each of the approximately ▮▮▮▮ telephone numbers automatically, with no human involvement.

Hopele's reliance on two outlier opinions – *Luna v. Shac*, 122 F. Supp. 3d 936 (N.D. Cal. 2015) and *Jenkins v. mGage, LLC*, No. 14-cv- 2791-WSD, 2016 WL 4263937 (N.D. Ga. Aug. 12, 2016) – does not change the outcome.  Respectfully, the courts in those cases misunderstood and misapplied the 2003 TCPA Order as Judge Kenneth A. Marra observed almost three years ago. *See Keim v. ADF Midatlantic, Ltd. Liab. Co.*, No. 12-80577-CIV, 2015 U.S. Dist. LEXIS 159070, *15 (S.D. Fla. Nov. 9, 2015) (Judge Marra reviewing *Luna* and *Jenkins* noted that "[n]one of these decisions are persuasive. The court declines to follow these cases because they all impose a *requirement* that an autodialer have the capacity to dial numbers without human intervention….") (emphasis in the original).  As discussed in detail below, the analysis correctly applied by the majority of courts focuses on whether the *dialing* occurred without human intervention.  Here, the EZ-Texting platform dialed over ███████ text messages with no human involved.

Third, Hopele's effort to minimize the harm it caused Plaintiff and Class Members is unavailing.  Regardless of how Hopele wishes to characterize the harm it caused, the undisputed fact remains that Hopele caused two unsolicited text messages to be transmitted to Plaintiff's cellular phone, violating her substantive rights under the TCPA to be free from unsolicited robocall calls.  As recently held by Judge Elizabeth A. Kovachevich – after conducting an "independent review of *all* of the Eleventh Circuit cases after *Spokeo*" – the transmission of an autodialed call to a plaintiff is an invasion of privacy and intrusion "upon [her] seclusion," and a "particularized and concrete injury sufficient to confer Article III standing." *Baxter v. VSC Ltd. Liab. Co.*, No. 8:17-cv-1718-T-17TGW, 2018 U.S. Dist. LEXIS 41650 (M.D. Fla. Mar. 13, 2018) (quoting *Tillman v. Ally Fin. Inc.*, No. 2:16-CV-313-FTM-99CM, 2016 U.S. Dist. LEXIS 164997, 2016 WL 6996113, at M (M.D. Fla. Nov. 30, 2016)).

Fourth, it is undisputed that Hopele acted knowing and willfully.  Contrary to the self-serving standard advanced by Hopele, a defendant need not know that it was violating the TCPA to be found to have acted knowing and willfully.  Rather, "[t]he requirement of 'willful[] or knowing[]' conduct requires the violator to know he was ***performing the conduct*** that violates the statute." *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015) (alteration in original) (emphasis added).

In sum, Hopele has failed to meet its burden and is not entitled to summary judgment. Hopele's Motion should be denied and Hopele should be held accountable for the ███████ of

text messages that caused harm and disruption to the daily lives of Plaintiff and members of the putative classe.

## II.   ARGUMENT AND MEMORANDUM OF LAW

### A.   The EZ-Texting Platform is an ATDS.

The TCPA defines an "automatic telephone dialing system" as "equipment which has the **capacity** – (A) to store **or** produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* at § 227(a)(1) (emphasis added).  A court's inquiry must focus on "whether [the] telephone system [utilized by the defendant] has the requisite capacity to be considered an ATDS under the TCPA," not whether that capacity was in fact utilized in the placement of the allegedly violative calls at issue.  *Id.*  "This interpretation is only strengthened by the interpretational principle that, '[b]ecause the TCPA is a remedial statute, it should be construed to benefit consumers.'"  *Hunt v. 21st Mortg. Corp.*, No. 2:12-CV-2697-WMA, 2013 U.S. Dist. LEXIS 132574, at *9 (N.D. Ala. Sep. 17, 2013) (quoting *Gager v. Dell Fin. Servs., LLC*, 12-2823, 727 F.3d 265, 2013 U.S. App. LEXIS 17579, 2013 WL 4463305 (3d Cir. Aug. 22, 2013)).

The equipment used by Hopele to transmit ▌▌▌ text messages is an ATDS under the plain language of the statute.  The equipment has the *capacity* to, and did in fact, store telephone numbers using a random or sequential generator, and dial such numbers.  Additionally, as Hopele concedes[1] in its Motion, the recent decision in *ACA Int'l v. FCC*, No. 15-1211, 2018 U.S. App. LEXIS 6535 (D.C. Cir. Mar. 16, 2018) ("*ACA*"), did not invalidate the FCC's 2003 TCPA ruling that an ATDS is equipment that (1) "store[s] pre-programmed numbers or receive[s] numbers from a computer database;" (2) can "dial those numbers at random, in sequential order, or from a database of numbers;" and (3) its "basic function" is "the *capacity* to dial numbers without human intervention."  *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, at 14090-92 (2003) (the "2003 TCPA Order") (emphasis original); *see also Lardner v. Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1223 (S.D. Fla. 2014) (equipment "qualifies as an ATDS under the statute because it automatically dials telephone numbers from a

---

[1] Hopele does not dispute that the FCC's 2003 TCPA Order remains in effect and governs this Court's analysis.  *See* Mot. at pg. 10 (citing *ACA* and the 2003 Order, and stating that the "basic function of an autodialer is the ability to dial numbers without human intervention").

preprogrammed list.").  As discussed below, the equipment used by Hopele has the *capacity* to dial numbers from a list without human intervention.  Finally, the equipment used by Hopele has the *capacity* to store telephone numbers and dial such numbers automatically.

### 1.  *The EZ-Texting Platform has the Capacity to Store Numbers Using a Random or Sequential Generator, and Dial Such Numbers.*

The EZ-Texting platform has the *capacity* to, and did in fact, store Plaintiff's and the putative Class Member's telephone numbers.  At deposition, ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.  Hopele Dep. at 88:16 – 89:5, 91:5-8, and 90:12 – 91:4.[2]  Thus, between the time the numbers were uploaded and the time they were ultimately dialed, they were stored within the EZ-Texting platform.  *See* Expert Report of Randall A. Snyder at ¶¶ 34, 38, 58, 98, 99, 102 (explaining that the equipment used by Defendant stored telephone numbers).[3]  Additionally, the EZ-Texting platform has the capacity to generate random or sequential numbers.  *See* Expert Report of Randall A. Snyder at ¶¶ 13, 85-88 (explaining that the EZ-Texting platform has the requisite capacity).  Utilizing its capacity to store numbers using a random or sequential generator, the EZ-Texting platform then dialed Plaintiff's and Class Members' telephone numbers in sequence.  *See* Expert Report of Randall A. Snyder at ¶ 13, 40, 54, 56, 58, and 88 (explaining that the EZ-Texting platform dialed numbers); *see also ACA Int'l*, 2018 U.S. App. LEXIS 6535 at *33 ("Anytime phone numbers are dialed from a set list, the database of numbers must be called in *some* order—either in a random or some other sequence.") (emphasis original).  Therefore, the EZ-Texting platform clearly falls within the plain definition of ATDS.

### 2.  *The EZ-Texting Platform Has the Capacity to Dial Numbers From a List Without Human Intervention.*

"Focusing on the FCC's reasoning that the defining characteristic of an ATDS is the 'capacity to dial numbers without human intervention,'" courts in this District and others "have found equipment to qualify as an ATDS if it can dial numbers automatically, for example by calling or sending text messages to numbers in a pre-programmed list, irrespective of the presence of a random or sequential number generator." *Legg v. Voice Media Grp., Inc.*, 20 F. Supp. 3d 1370,

---

[2] A copy of Hopele's Deposition Transcript is attached as **Exhibit A**.

[3] A copy of Randall A. Snyder's Expert Report is attached as **Exhibit B**.

1375 (S.D. Fla. 2014) (citing *Lardner*, 17 F. Supp. 3d at 1224 (citing 2003 FCC Order to determine that "systems that automatically dial cell phone numbers from a preprogrammed list" fall within ATDS definition); *Fields v. Mobile Messengers Am., Inc.*, No. 12-05160, 2013 U.S. Dist. LEXIS 180227, at *9-12 (N.D. Cal. Dec. 23, 2013) (citing 2003 FCC Order and finding that evidence of text messages sent without human intervention was sufficient to preclude summary judgment on whether ATDS was used); *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129-30 (W.D. Wash. 2012) (citing 2003 FCC Order to find that plaintiff sufficiently pled use of ATDS where he alleged facts suggesting automated transmission of text messages); *Rivas v. Receivables Performance Mgmt., LLC*, No. 08-61312, 2009 U.S. Dist. LEXIS 129378 at *12-13 (S.D. Fla. Sept. 1, 2009) (plaintiff created issue of fact on use of ATDS precluding summary judgment where evidence suggested "computer device that dialed Plaintiff's number without human intervention")).

In *Keim. Co*, Judge Kenneth A. Marra denied the very argument advanced by Hopele here because the defendant in that case contended "only that human intervention [was] involved when the cell phone number [was] dialed, **but they say nothing regarding the *capacity* of the equipment to dial numbers without human intervention**. The FCC orders make clear that it is the capacity of the equipment, not its present use, that is the relevant inquiry." No. 12-80577-CIV, 2015 U.S. Dist. LEXIS 159070, at *21 (S.D. Fla. Nov. 9, 2015) (bold/underline emphasis added; italicized emphasis in the original). Here, Hopele devotes several pages in an attempt to convince the Court that the text messages were transmitted as a result of human intervention (which they were not as discussed below). Tellingly, however, the word "capacity" appears only once in the section of Hopele's Motion discussing human intervention, and it is simply in quoting the language of the statute. *See* Mot. at pgs. 10 – 13.

Like in *Keim*, Hopele is silent on whether the EZ-Texting platform has the *capacity* to dial numbers from a list without human intervention. Fortunately, Plaintiff's expert provides clarity on the issue. As opined by Plaintiff's expert, the EZ-Texting platform has *capacity* to dial numbers from a list without human intervention, which capacity was in fact utilized by Hopele to transmit the text messages at issue. *See* Expert Report of Randall A. Snyder at ¶¶ 13, 40, 59, 101, 102. Thus, under the 2003 TCPA Order, the EZ-Texting platform is an ATDS because it has the *capacity* to dial numbers from a list without human intervention.

### 3. The EZ-Texting Platform has the Capacity to Store Numbers and Dial Such Numbers Automatically.

An ATDS is also equipment that has the capacity to store numbers to be called and to dial such numbers automatically.  As stated above, the definition of ATDS is "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).  A practical reading of the statute is that the phrase "using a random or sequential number generator" modifies only the last antecedent "produce telephone numbers to be called," not "to store."  Such an interpretation is supported by the nearest-reasonable-referent canon, which provides that, "[w]hen the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent."  *Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1336 (11th Cir. 2016) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012)).

Here, the postpositive modifier ("using a random or sequential number generator") applies only to the nearest reasonable referent ("produce telephone numbers to be called").  Thus, under this reading of the statute, the equipment need only have the ability to store telephone numbers to be called, and to dial such numbers automatically.  And the doctrine of the last antecedent[4] does not lead to a different result because the doctrine "is of no great force," and "the natural and common sense reading of the statute, may overturn it and give it a more comprehensive application."  *Buscaglia v. Bowie*, 139 F.2d 294, 296 (1st Cir. 1943) (quoting Lewis, Sutherland Statutory Construction, Vol. 2, § 420).

This reading of the statute is supported by the FCC's 2003 TCPA Order, which "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS."  *ACA Int'l*, 2018 U.S. App. LEXIS 6535, at *34 (D.C. Cir. Mar. 16, 2018) (citing 2003 Order, 18 FCC Rcd. at 14091 ¶ 131 n.432).  As discussed above, the 2003 TCPA Order remains binding on this Court.

Furthermore, this interpretation is supported by the fact that the "TCPA is a remedial statute and thus entitled to a broad construction."  *Mey v. Monitronics Int'l, Inc.*, 959 F. Supp. 2d 927, 930 (N.D.W. Va. 2013) (citing *Holmes v. Back Doctors, Ltd.*, 695 F.Supp.2d 843, 854 (S.D. Ill. 2010)

---

[4] The doctrine "requires in statutory construction that qualifying words, where no contrary intention appears, be ordinarily applied solely to the words or phrase immediately preceding." *Buscaglia*, 139 F.2d at 296.

("It is true that . . . the TCPA is a remedial statute.")).  Indeed, the TCPA "should be liberally construed and should be interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers." *Mey*, 959 F. Supp. 2d at 930 (quoting *Scarborough v. Atlantic Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1950)); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987) (holding that when interpreting broad remedial statutes, courts should apply a "standard of liberal construction in order to accomplish [Congress's] objects" (citation omitted)); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 149 (2d Cir. 2000) ("[I]t is our duty to interpret remedial statutes broadly.").  Interpreting the statute broadly by defining an ATDS as equipment that has the capacity to store and dial numbers automatically is favored as it would discourage violations of the TCPA and protect consumers.

The EZ-Texting platform also falls within the definition of the plain language of the statute because it has the capacity to, and did in fact, store Plaintiff's and Class Members telephone numbers, and dialed such numbers automatically.  *See* Expert Report of Randall A. Snyder at ¶¶ 34, 38, 58, 98, 99, 102 (explaining that the equipment used by Hopele stored telephone numbers) and 27, 36, 39, 51, 56, 59, 102 (explaining that numbers were dialed and text messages sent automatically).

## B.  There was no Human Intervention in Dialing Calls to Plaintiff and Class Members.

In addition to the EZ-Texting platform having the *capacity* to dial numbers from a list without human intervention, Hopele used the functionality to automatically dial thousands of telephone numbers without human intervention.   Hopele does not dispute that the FCC's 2003 TCPA Order remains binding, and in fact relies on the Order for its misplaced human intervention argument.  Under the 2003 FCC Order, the "principal feature of predictive dialing software is a timing function, not number storage or generation," and the basic function of this technology is "the **capacity** to **dial numbers** without human intervention."   *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act*, 18 FCCRcd 14014, 14091-92, ¶¶ 131 & 132 (June 26, 2003) (emphasis added).

The majority of courts have relied on the 2003 TCPA Order to hold that a predictive dialer is an ATDS irrespective of whether it has the capacity to generate random or sequential telephone numbers. *See, e.g.*, *Fr. v. Ditech Fin.*, No. 8:17-cv-3038-T-24 MAP, 2018 U.S. Dist. LEXIS 58711, at *22 (M.D. Fla. Apr. 6, 2018) (citing *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1114 (11th Cir. 2014); *Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2016 U.S. Dist.

LEXIS 142259, at *16 (N.D. Ill. Oct. 14, 2016) (relying on FCC's 2003 Order to hold that predictive dialer is an ATDS); *Brown v. Account Control Tech., Inc.*, No. 0:13-62765-CIV-DIMITROULEAS, 2015 U.S. Dist. LEXIS 180605, at *8 (S.D. Fla. Jan. 15, 2015) (rejecting defendant's argument that predictive dialer is ATDS only if it has capacity to use random or sequential number generation); *Lardner*, 17 F. Supp. 3d at 1224 (device is ATDS if it automatically dials numbers from a preprogrammed list); *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (device that sends text messages to call list is ATDS even if it lacks capacity to generate numbers randomly or sequentially); *Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014) (predictive dialer that calls numbers without human intervention is ATDS); *Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 225 (D. Mass. 2014) (predictive dialer is ATDS even if it does not have capacity for random or sequential number generation); *Cabrera v. Gov't Emples. Ins. Co.*, No. 12-61390-CIV-WILLIAMS, 2014 U.S. Dist. LEXIS 192313, at *7 (S.D. Fla. Nov. 26, 2014) (any device that is able to dial numbers without human intervention, for example by calling numbers stored in a database, is an ATDS).

Further, the consensus among courts is that the 2003 TCPA Order is <u>not</u> limited to predictive dialers, and extends to any type of equipment that has the capacity to dial numbers from a list without human intervention. *See McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 U.S. Dist. LEXIS 12100, 2015 WL 428728, at *3 (N.D. Cal. Jan. 30, 2015); *Nunes v. Twitter, Inc.*, Case No. 14-CV-02843-VC, 2014 U.S. Dist. LEXIS 165846, 2014 WL 6708465, at *1-2 (N.D. Cal. Nov. 26, 2014); *Fields*, 2013 U.S. Dist. LEXIS 180227, at *9-12.

Indeed, the majority of courts have relied on the 2003 TCPA Order to hold that any device that has the capacity to dial numbers without human intervention is an ATDS, including a system that sends text messages *en masse* to multiple numbers. *Swaney v. Regions Bank*, No. 2:13-cv-00544-JHE, 2015 U.S. Dist. LEXIS 184752, at *12 (N.D. Ala. July 13, 2015) (text message sending system is ATDS because it has ability to dial numbers without human intervention ); *Zeidel v. A&M (2015) LLC*, No. 13-cv-6989, 2017 U.S. Dist. LEXIS 48024, at *27 (N.D. Ill. Mar. 30, 2017) (relying on 2003 order to hold that device that sends text messages *en masse* is ATDS regardless of whether it has capacity to generate numbers sequentially or randomly);  *Cabrera*, 2014 U.S. Dist. LEXIS 192313, at *7 (holding that any device that is able to dial numbers without human intervention, for example by calling numbers stored in a database, is an ATDS).

In conducting a human intervention analysis, "'the primary consideration . . . is whether human intervention is required **at the point in time at which the number is dialed**.'" *Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016) (Cohn, J.) (quoting *Brown v. NRA Grp., LLC*, No. 6:14-CV-610-ORL-31, 2015 U.S. Dist. LEXIS 73065, 2015 WL 3562740, at *2 (M.D. Fla. June 5, 2015)) (emphasis added); (citing *Legg*, 20 F. Supp. 3d 1370 at 1374 (explaining that "defining characteristic" of ATDS is "capacity to dial numbers without human intervention")); *see also Johnson v. Yahoo!, Inc.*, 2014 U.S. Dist. LEXIS 171325, 2014 WL 7005102, at *3 (N.D. Ill. Dec. 11, 2014) ("Every ATDS requires some initial act of human agency—be it turning on the machine or pressing 'Go.' It does not follow, however, that every subsequent call the machine dials—or message it sends—is a product of that human intervention.").

Consistent with this analysis, "courts have rejected the argument that the amount of human intervention involved in merely entering a customer's telephone numbers into an electronic database removes the equipment from the definition of an ATDS." *Zeidel,* 2017 U.S. Dist. LEXIS 48024, at *32 (citing *Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639, 654 (N.D.W. Va. 2014) ("[I]t is irrelevant under the FCC's definition of a predictive dialer that humans are involved in the process of creating the lists that are entered into the Campaign Manager software"); *Sterk*, 46 F. Supp. 3d at 819 (finding that defendant's human intervention "merely relates to the collection of numbers" while its agent "then uses automated equipment to make calls from that list," and granting summary judgment for plaintiff because "calls from a stored list without human intervention is comparable to the predictive dialers")).

In *NRA Grp.*, for example, the evidence demonstrated that "once an NRA collector logs in and makes a request, the [dialing platform] starts dialing from an existing list of numbers; any busy signals or answering machine calls are dropped, and the next number on the list is called, all without human intervention, until a person finally answers and is connected to a collector (assuming one is available)." 2015 U.S. Dist. LEXIS 73065, 2015 WL 3562740, at *2.  In rejecting the NRA's human intervention argument, the court held that the "minimal amount of human intervention is entirely consistent with the FCC's description of predictive dialers as devices that 'store pre-preprogrammed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers.'" *Id.*

Similarly, in *Morse*, the defendant argued that various steps prior to the dialing of the calls were as a result of human intervention and, thus, the equipment was not an ATDS.  65 F. Supp. 3d

407 at 410.  In response, the plaintiff explained that the "human intervention test of the 2003 FCC Order does not inquire as to whether there is human intervention at the entering of a 'given set of numbers' or programming of the computer system, but rather if there is human intervention at the time a call is made/placed or when a number is actually dialed."  *Id*.  The court agreed, holding that "[i]t is the ultimate calling from the list by the automated equipment that is the violation of the TCPA."  *Id*. (quoting *Sterk*, 46 F. Supp. 3d at 819).

In *Zeidel*, the defendant argued human intervention because it (1) inputted telephone numbers into its list, and (2) wrote the content of the text messages.  No. 13-cv-6989, 2017 U.S. Dist. LEXIS 48024, at *31 (N.D. Ill. Mar. 30, 2017).  In rejecting the defendant's argument, the court first noted that there "is no further human involvement in sending these text messages, thousands of which were sent every month."  *Id*.  Ultimately, the court found no human intervention, noting that the human intervention inquiry is not "whether there is human intervention at the entering of a 'given set of numbers' or programming of the computer system, but rather if there is human intervention at the time a call is made/placed or when a number is actually dialed."  *Id*. (quoting *Morse*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014).

Here, Hopele advances a human intervention test that is not supported by the 2003 TCPA Order or majority view.  Hopele completely ignores that there was no human intervention at the time the EZ-Texting platform dialed over ▮▮▮▮▮ text messages in a matter of minutes or even seconds, a task that would be impossible if being done manually.  Instead, Hopele incorrectly focuses on the steps taken leading up to the actual dialing, such as inputting telephone numbers and creating the content of the text messages.  As established by the above authority, these steps are immaterial, the only relevant inquiry is whether a human was involved when the calls were made.



The undisputed facts are that there was no human involvement in dialing.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Hopele Dep. at 81:16-25.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Hopele Dep. at 88:16 – 89:5, 91:5-8, 91:20 – 92:11, 94:10-14, 93:2-7, 94:7-9; *see also* Expert Report of Randall A. Snyder at ¶¶ 13, 40, 54, 59, 101, 102 (explaining that telephone numbers were dialed from a list, without human intervention).  Hopele finds support for its incorrect test in two outlier opinions – *Luna v. Shac*, 122 F. Supp. 3d

936 (N.D. Cal. 2015) and *Jenkins v. mGage, LLC*, No. 14-cv- 2791-WSD, 2016 WL 4263937 (N.D. Ga. Aug. 12, 2016).  Simply put, those cases stand alone and applied several incorrect standards as Judge Kenneth A. Marra observed.  *See Keim*, 2015 U.S. Dist. LEXIS 159070, at *15.

For example, the court in *Luna* held that "the capacity to dial numbers without human intervention is required for TCPA liability."  122 F. Supp. 3d 936, 940 (N.D. Cal. 2015).  This is incorrect.  As discussed above, the 2003 TCPA Order added to the definition of an ATDS equipment that has the capacity to dial numbers without human intervention, but it did not make it a requirement for TCPA liability.  The court in *Luna* went on to misinterpret the 2003 TCPA Order by focusing entirely on the steps leading up to the dialing of the telephone numbers at issue, while completely ignoring the fact that the numbers were *dialed* without human intervention.  *See id*. ("human intervention was involved in several stages of the process…including transferring of the telephone number into the CallFire database, drafting the message, determining the timing of the message, and clicking 'send' on the website to transmit the message to Plaintiff."  And the court in *Jenkins* simply followed the incorrect analysis set out in *Luna*.  2016 WL 4263937, at *19 (N.D. Ga. Aug. 12, 2016) ("The Court agrees with the *Luna* court's analysis.").

In all, the undisputed facts show that the EZ-Texting platform *dialed* ▮▮▮▮▮ of telephone numbers ▮▮▮▮▮ in a matter of seconds with no human intervention.  Under the 2003 TCPA Order and majority view, this system is an ATDS, and the Court should deny Hopele's Motion for Summary Judgment.

## C.  Plaintiff has Standing.

The injury-in-fact requirement "serves to distinguish a person with a direct stake in the outcome of litigation—even though small—from a person with a mere interest in the problem." *ACLU of Ga. v. Rabun Cty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1108 (11th Cir. 1983) (per curiam) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)).  This "direct stake" can take many forms. Certainly, economic or tangible injuries are concrete. Intangible harms can also be concrete.  *Spokeo*, 136 S. Ct. at 1549. Further, the concreteness requirement can be satisfied by a risk of real harm. *Id*.

Whatever the type of injury, the operative question is whether it is "real," or "*de facto*"; in other words, a concrete injury "must actually exist." *Id*. at 1548. In identifying an injury in fact, the size of the harm is irrelevant. Even "an identifiable trifle" is sufficient. *SCRAP*, 412 U.S. at 689 n.14; *see also id.* at 689 (requiring an allegation only of "perceptibl[e] harm"). The

concreteness requirement stems from the constitutional requirement of a case or controversy, *Spokeo*, 136 S. Ct. at 1547, and thus serves to ensure that a dispute is "in a form traditionally capable of judicial resolution," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221-22 (1974), not to measure its significance, *SCRAP*, 412 U.S. at 689 n.14.

### 1.  *History or Congress's Judgment Can Establish That a Harm is Concrete.*

*Spokeo* recognized two wellsprings that the Supreme Court has used to determine whether an intangible harm is concrete: "history and the judgment of Congress." 136 S. Ct. at 1549. An inquiry into history asks whether a plaintiff's "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.*; *see, e.g.*, *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279-80 (11th Cir. 2017). An inquiry into congressional judgment recognizes that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*, 136 S. Ct. at 1549; *see, e.g.*, *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1340 (11th Cir. 2017). Congress can "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 136 S. Ct. at 1549 (alteration in original) (quoting *Lujan*, 504 U.S. at 578). "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.* (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in judgment)).

*Spokeo*'s recognition that Congress's judgment is "instructive and important," *id.*, reaffirms long-established doctrine. The Supreme Court has repeatedly recognized that the "injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Lujan*, 504 U.S. at 578 (quoting *Warth*, 422 U.S. at 500 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, n.3 (1973))); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982).

In practice, this doctrine means that the "structure and purpose" of a statute can show that an injury to an interest protected by that statute is concrete. *Perry*, 854 F.3d at 1340. The judgment of Congress is particularly persuasive when Congress has created a right, a statute provides the ability to enforce that right, and a plaintiff alleges an "injury in precisely the form the statute was intended to guard against." *See Havens*, 455 U.S. at 373; *see also Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 6 (1968) ("[W]hen the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance

with that provision."); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1332-34 (11th Cir. 2013) (in holding that a statutory violation can constitute an injury in fact, identifying a statutory "right to be free from discrimination on the basis of disability" and concluding that when a plaintiff "encounters" certain barriers, he "has suffered injury in precisely the form the statute was intended to guard against" (quoting and citing *Havens*, 455 U.S. at 373-74)).

The Supreme Court's opinion in *Havens Realty Corp. v. Coleman* is an instructive example of how Congress's judgment can show that an injury is concrete. *Havens* concerned a claim that a realty company lied to African-Americans about the availability of apartments and thus violated the Fair Housing Act's prohibition on race-based misrepresentations about the availability of housing. 455 U.S. at 366-68 & n.2, 373. One individual plaintiff had received incorrect information about housing options while acting a "tester"—that is, while posing as someone looking for housing, rather than while conducting an actual housing search. 455 U.S. at 368, 373-74. Although she had not suffered any harm other than the inaccurate information, the Court held that she had standing, after first concluding that the Fair Housing Act created "an enforceable right to truthful information," *id.* at 373, and then recognizing that if the plaintiff alleged that this right was violated, then she had "suffered injury in precisely the form the statute was intended to guard against," *id.* at 373-74. As Justice Thomas's *Spokeo* concurrence explains, the reasoning of *Havens* is fully consistent with *Spokeo*'s conception of concrete injury. *See* 136 S. Ct. at 1554 (Thomas, J., concurring).

The Eleventh Circuit has twice applied similar logic to conclude that TCPA plaintiffs have standing. The first TCPA standing case, *Palm Beach Golf*, centered on a fax advertisement alleged to violate the TCPA. The plaintiff argued that it had standing because it suffered a concrete and particularized injury: "the [defendant's] sending of the fax and resulting occupation of [the plaintiff's] telephone line and fax machine." 781 F.3d at 1250. Similar to the Supreme Court's holding in *Havens*, the Eleventh Circuit in *Palm Beach Golf* first recognized that the TCPA implied a cognizable right for citizens to be protected "from the loss of use of their fax machines during the transmission of fax data." *Id.* at 1252. Then, the Eleventh Circuit noted that "Congress created a private right of action for enforcement of violations of the statute … and provided statutory damages for a 'junk' fax recipient." *Id.* (footnote omitted). With this context, the Eleventh Circuit concluded that the plaintiff suffered an injury in fact because the disputed fax was transmitted and

occupied the plaintiff's fax machine and telephone line, and "occupation of Plaintiff's fax machine [was] among the injuries intended to be prevented by the statute." *Id.* at 1253.

Following *Spokeo*, the Eleventh Circuit again held in *Florence Endocrine* that a plaintiff had standing to sue for a violation of the TCPA's fax provisions. In reaching this conclusion, *Florence Endocrine* reaffirmed *Palm Beach Golf*'s holdings that the TCPA created a "cognizable right," 858 F.3d at 1366 (quoting *Palm Beach Golf*, 781 F.3d at 1252), and that "concrete injury" occurs when a "fax machine is occupied while [an] unsolicited fax is being sent," *id.* (also recognizing injury associated with the cost of printing). The court then held that the assertion in the complaint that the plaintiff had received unsolicited faxes was sufficient to allege this concrete fax-machine injury. *Id.*

Since *Spokeo*, the Eleventh Circuit has also recognized the continuing importance of *Havens* in other opinions. *See Perry*, 854 F.3d at 1339 (11th Cir. 2017) (citing *Havens* to support the proposition that a plaintiff might not need to allege harm "beyond the one Congress has identified") (quoting *Spokeo*, 136 S. Ct. at 1549)); *Church v. Accretive Health, Inc.*, 654 F. App'x 990, 994 (11th Cir. 2016) (per curiam) (holding that "[j]ust as the tester-plaintiff had alleged injury to her statutorily-created right to truthful housing information, so too has Church alleged injury to her statutorily-created right to information pursuant to the FDCPA").

### 2. *Injuries in Fact Include Statutory Violations.*

*Spokeo* confirmed that an injury that creates standing can be either a violation of a plaintiff's statutory rights or some other harm caused by the defendant's unlawful conduct, as long as the relevant injury is concrete (as well as particularized). 136 S. Ct. at 1548-49. *Spokeo* concerned claimed procedural violations, and in remanding the case to the Ninth Circuit to reconsider whether the plaintiff had standing, *id.* at 1550, the Supreme Court recognized that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," *id.* at 1549. "In other words, a plaintiff … need not allege any *additional* harm beyond the one Congress has identified." *Id.* (citing, as examples, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20-25 (1998) and *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989)). More generally, Justice Thomas explained that when private rights are at issue, the Supreme Court's "contemporary decisions have not required a plaintiff to assert an actual injury beyond the violation of his personal legal rights to satisfy the 'injury-in-fact' requirement." *Id.* at 1552 (Thomas, J., concurring).

Consistent with *Spokeo*, the Eleventh Circuit has recognized that standing analysis "does not end" merely because a plaintiff "does not allege any additional harm beyond the statutory violation." *Perry*, 854 F.3d at 1340. To the contrary, the Eleventh Circuit concluded in *Perry* that a plaintiff satisfied the injury-in-fact requirement with allegation of a statutory violation: a breach of the Video Privacy Protection Act, which prohibits disclosures by video tape service providers of rental or sales records. *Id*. at 1340-41.

Despite *Spokeo* and *Perry*, many defendants broadly challenge the notion that a statutory violation can suffice to establish standing. In particular, they argue that *Palm Beach Golf* and *Florence Endocrine* eliminate the possibility that TCPA violations can be concrete injuries. They are wrong. With regard to the fax provisions of the TCPA, neither *Palm Beach Golf* nor *Florence Endocrine* states that a statutory violation is not, without more, a concrete injury. To the contrary, they support the opposite proposition: that a TCPA violation without more can constitute concrete injury.

In *Palm Beach Golf*, the Eleventh Circuit viewed the temporary occupation of a fax machine as a concrete injury to rights protected by the statute. *See* 781 F.3d at 1251-52 (recognizing a right inferred in the statute). *Florence Endocrine* emphasized that the fax machine injury is inherent in the statutory violation. As explained by the district court in that case, the relevant allegation was that the plaintiff received several prohibited faxes. *See Florence Endocrine Clinic, PLLC v. Arriva Medical, LLC*, No. 16-1289, 2016 WL 9444356, at *2 (N.D. Ala. Nov. 30, 2016) (citing complaint); *see also* 858 F.3d at 1366 (quoting complaint). The defendant argued that the plaintiff lacked standing because it alleged only "a bare violation of the statute." 2016 WL 9444356, at *2 (quoting motion papers). The district court rejected this argument and concluded that the plaintiff had suffered a concrete injury because the alleged transmission of prohibited faxes necessarily entailed the injury identified in *Palm Beach Golf*: occupation of a telephone line and fax machine. *Id*. In other words, the court found that the plaintiff had standing based on an allegation of a statutory violation alone. The district court's holding rested on *Spokeo*'s recognition of Congress's authority to make injuries cognizable even if they "were previously inadequate at law." *Id*. (quoting *Spokeo*, 136 S. Ct at 1549). The Eleventh Circuit, in affirming, similarly stated: "[W]here a statute confers new legal rights on a person, that person will have Article III standing to sue where the facts establish a concrete, particularized, and personal injury to that person as a

result of the violation of the newly created legal rights." 858 F.3d at 1366 (quoting *Palm Beach Golf*, 781 F.3d at 1251); *see also id.* (citing the district court's reasoning).

Furthermore, many defendants, such as Hopele does here, argue that a minimal amount of text messages means that there was no harm. Again, they are wrong as this creates an issue of degree of harm, not kind. As confirmed by Eleventh Circuit precedent, when Congress creates a substantive legal right to be free from a certain harm, even a minimal violation of that statute creates Article III standing.  Citing both *Havens Realty* and *Spokeo*, the Eleventh Circuit held that a debt collector's violation of a debtor's statutory right to under the Fair Debt Collection Practices Act, by itself, was enough to meet the concrete injury requirement.  *See Church v. Accretive Health, Inc.*, No. 15-15708, 2016 WL 3611543, at *3 (11th Cir. July 6, 2016).  Noting that right was substantive, the Court ruled that "Congress has created a new right—the right to receive the required disclosures in communications governed by the FDCPA—and a new injury—not receiving such disclosures." *Id*.

Here, Hopele violated Plaintiff's substantive rights under the TCPA and Plaintiff is not required to show any additional harm.  Hopele's emphasis on the fact that Plaintiff rolled her eyes and was not particularly bothered by the text is a red herring. Whether extremely upset because the illegal marketing text interrupted her or just a minor annoyance, the violation of Plaintiff's substantive rights was the same. Contrary to Hopele's arguments, there is not a *de minimis* exception to the TCPA that allows it to avoid liability if a plaintiff is not extremely bothered by the illegal text messages.   As explained by the Third Circuit in reversing a dismissal for lack of standing of a TCPA claim based on *Spokeo*:

> Congress squarely identified this injury. The TCPA addresses itself directly ***to single prerecorded calls*** from cell phones, and states that its prohibition acts "in the interest of [ ] privacy rights." 47 U.S.C. § 227(b)(2)(C). The congressional findings in support of the TCPA likewise refer to complaints that "automated or prerecorded telephone calls are a nuisance [and] . . . an invasion of privacy." Pub. L. 102-243, § 2. We therefore agree with Susinno that in asserting "nuisance and invasion of privacy" resulting from ***a single prerecorded telephone call***, her complaint asserts "the very harm that Congress sought to prevent," arising from prototypical conduct proscribed by the TCPA.

*Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (emphasis added) *accord LaVigne v. First Cmty. Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1146 (D.N.M. 2016) ("Defendant

argues that Plaintiff cannot show concrete injury for each telephone call, but the problem with this argument is that Article III requirements for an injury-in-fact do not contain a 'minimum' cost or harm threshold. ***Regardless of how small the harm is, it is actual and it is real.***") (emphasis added).

Furthermore, Hopele's reliance upon on cases where the plaintiff was suing for a violation of other statutes is unpersuasive. For example, Hopele relies upon *Mejia v. Ocwen Loan Servicing, LLC*, 703 F. App'x 860, 864 (11th Cir. 2017), a case in which the plaintiff alleged statutory damages under RESPA's "pattern or practice" provision. MSJ at 17-18. However, as explained by the Eleventh Circuit, the relevant provision stated that: "'The following damages are recoverable under RESPA for a section 2605 violation: '(A) any actual damages to the borrower as a result of the failure; and (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.'" *Id*. As explained by the *Mejia* court, because the plaintiff failed to state a cause of action because the defendant's alleged conduct was not barred by RESPA, there could not be a concrete injury for "pattern or practice" because there was no illegal pattern or practice. *Id*. at 864-65. The Eleventh Circuit certainly did not hold that an actual statutory violation that violated a plaintiff's substantive legal rights does not cause a sufficient injury for standing.

Because the TCPA is completely unlike the FCRA in that there can be no way that a TCPA violation does not result in the harm Congress intended to curb, this Court should reject Hopele's argument that Plaintiff lacks Article III standing that is not supported by any TCPA cases from the Eleventh Circuit. Hopele ignores precedent from this Circuit, instead choosing to cite outlier opinions from other courts or Eleventh Circuit cases that do not involve the TCPA.  In addition to violating Plaintiff's substantive rights, Hopele caused Plaintiff tangible injuries, including invasion of Plaintiff's privacy, intrusion and occupation of Plaintiff's phone, and nuisance and interruption of Plaintiff's daily life. The degree to which Hopele did so is irrelevant.  Through a TCPA claim, a plaintiff "seeks to remedy Hopele's alleged invasion of privacy, nuisance, and trespass on her cellular telephone. These kinds of torts have 'long been heard by American courts, and the right of privacy is recognized by most states.'"  *Mohamed v. Off Lease Only, Inc.*, No. 15-23352-Civ-COOKE/TORRES, 2017 U.S. Dist. LEXIS 41023, at *6 (S.D. Fla. Mar. 22, 2017) (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)).  Thus, this Court should reject Hopele's arguments and deny the motion for summary judgment on lack of standing.

### D.  **Hopele Violated the TCPA Willfully and Knowingly**

Hopele's argument that it believed it had Plaintiff's consent to send the illegal marketing text messages, thus removing it from the specter of treble damages for a willful and knowing violation of the TCPA, is nothing more than a self-serving legal conclusion and falls well short of eliminating all genuine issues of material fact.  Additionally, Hopele misconstrues what conduct must be willful and knowing.  There is adequate record evidence that Hopele's conduct with respect to each and every element of the TCPA violation at issue was willful and knowing.  Thus, this Court should reject Hopele's arguments, and deny summary judgment to Hopele on the willful and knowing prong of its TCPA violation.

Contrary to Hopele's argument, there is no requirement that a defendant act with malice or consciousness of guilt of a TCPA violation. "The requirement of 'willful[] or knowing[]' conduct requires the violator to know he was ***performing the conduct*** that violates the statute." *Lary*, 780 F.3d 1101 at 1107 (alteration in original) (emphasis added). However, the willful and knowing prong does not require that a defendant know that his willful and knowing conduct violated the TCPA, or even know that the TCPA exists. Interestingly, *Lary* was cited by Hopele, but Hopele ignored the portion of the opinion that explains this precisely. The *Lary* court gave the following example that should make it abundantly clear that the Eleventh Circuit requires the conduct to be willful and knowing, rather than knowledge that the conduct violates the TCPA.

> For example, to violate section 227(b)(1)(A)(i), a defendant must know that he is using an "automatic telephone dialing system" to place a "call," and that the call is directed toward an "emergency" line. Id. § 227(b)(1)(A)(i). If we interpreted the statute to require only that the violator knew he was making a "call" or sending a fax, the statute would have almost no room for violations that are not "willful[] or knowing[]."

*Id*. Notably, the analysis performed by the *Lary* court was entirely silent as to knowledge that the conduct violated the TCPA. Rather, all that the defendant needed to know was that it was using an ATDS to place a call to an emergency line.

Similarly, in cellular phone cases, "a court may award treble damages if the plaintiff proves 'that the defendant knew, for example, that it did not have consent to call the plaintiff's cellular phone number.'" *Ewton v. Pushpin Holdings, LLC*, No. 8:16-cv-00978-CEH-TBM, 2017 U.S. Dist. LEXIS 31441, at *7-8 (M.D. Fla. Mar. 6, 2017) (quoting *McBeth v. Credit Protec. Ass'n, L.P.*, No. 8:14-CV-606-T-36AEP, 2015 U.S. Dist. LEXIS 94016, 2015 WL 4429324, at *3 (M.D.

Fla. July 20, 2015)). Thus, Hopele's alleged lack of knowledge of the TCPA is irrelevant. All that is relevant is whether Hopele knew that: (1) it was sending texts to Plaintiff's (and other class members') cellular phone(s) using an ATDS; and (2) that it lacked express written consent to do so. *Id*.



Hopele Dep. at 33:6-15.

Hopele Dep. at 33:21-24.



Hopele Dep. at 48:10 – 49:2.



. If anything, the record shows that Hopele knew it lacked consent and in response to a leading question by its counsel at deposition made the legally conclusory statement that it thought it had consent. At best, this does nothing more than create a fact issue that should be resolved by a jury, and summary judgment on the "willful and knowingly" element of the TCPA violation must be denied.[5]

### III.   CONCLUSION

Hopele has failed to meet its burden and its Motion for Summary Judgment should be denied.  Hopele willfully and knowingly violated the TCPA over ██████████, using an ATDS, and causing harm to Plaintiff and Class Members.

---

[5] ███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
██████████████████████████

**WHEREFORE,** Plaintiff Katiria Ramos, respectfully requests and order denying Hopele's Motion for Summary Judgment, and for such other relief as deemed appropriate by the Court.

Date:  April 6, 2018

Respectfully submitted,

| | |
|---|---|
| **HIRALDO P.A.**<br><br>*/s/ Manuel S. Hiraldo* <br>Manuel S. Hiraldo, Esq.<br>Florida Bar No. 030380<br>401 E. Las Olas Boulevard<br>Suite 1400<br>Ft. Lauderdale, Florida 33301<br>mhiraldo@hiraldolaw.com<br>Telephone: 954.400.4713<br><br>*Counsel for Plaintiff and the Class* | **KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**<br>Jeffrey M. Ostrow, Esq.<br>Florida Bar No. 121452<br>ostrow@kolawyers.com<br>Scott A. Edelsberg, Esq.<br>Florida Bar No. 100537<br>edelsberg@kolawyers.com<br>1 W. Las Olas Blvd.<br>Suite 500<br>Fort Lauderdale, Florida 33301<br>(t) 954-449-4602<br><br>*Counsel for Plaintiff and the Class* |
| **SHAMIS & GENTILE, P.A.**<br>Andrew J. Shamis<br>Florida Bar No. 101754<br>ashamis@shamisgentile.com<br>14 NE 1st Avenue, Suite 400<br>Miami, Florida  33132<br>(t) (305) 479-2299<br>(f) (786) 623-0915<br><br>*Counsel for Plaintiff and the Class* | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 6, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: <u>*/s/ Manuel S. Hiraldo*</u>
Manuel S. Hiraldo, Esq.
HIRALDO P.A.
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Florida Bar No. 030380
mhiraldo@hiraldolaw.com
Telephone: 954.400.4713