UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CV-62100-MORENO/SELTZER

KATIRIA RAMOS, individually and
on behalf of all others similarly situated,

      Plaintiff,

vs.

HOPELE OF FORT LAUDERDALE,
LLC d/b/a PANDORA @ GALLERIA,
a Florida limited liability company, and
PANDORA JEWELRY, LLC, a Maryland
limited liability company,

      Defendants.

_____/

**Motion assigned to Magistrate Judge
Barry S. Seltzer pursuant to this Court's
February 26, 2018 Order [ECF No. 40]**

**DEFENDANT PANDORA JEWELRY, LLC'S *DAUBERT* MOTION TO STRIKE OR
EXCLUDE THE OPINIONS OF PLAINTIFF'S PUTATIVE EXPERT WITNESS
<u>RANDALL A. SNYDER AND INCORPORATED MEMORANDUM OF LAW</u>**

Defendant Pandora Jewelry, LLC ("Pandora") moves to exclude the testimony of plaintiff's putative expert witness, Randall A. Snyder ("Snyder"), on the grounds that his purported opinions regarding (1) the alleged use of an automatic telephone dialing system ("ATDS"), and (2) ascertainability of the putative class, fail to meet the standards of admissibility established by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

## PRELIMINARY STATEMENT

Plaintiff's Motion for Summary Judgment [Dkt. 68] and Motion for Class Certification [Dkt. 61] rest primarily on the purported expert testimony of Randall Snyder whose opinions in prior TCPA cases have repeatedly been ruled unreliable and irrelevant. *See, e.g.*, *Legg v. Voice Media Group, Inc.*, No. 13-62044-CIV, 2014 WL 1767097, at *4-5 (S.D. Fla. May 2, 2014) (excluding Snyder's opinions on ATDS because they were improper legal conclusions and lacked adequate foundation); *Marshall v. CBE Group, Inc.*, No. 2:16-cv-02406-GMN-NJK, 2018 WL 1567852, at *6-7 (D. Nev. Mar. 30, 2018) (holding that Snyder's conclusion that the system had the requisite capacity function as an ATDS was unsupported by his premises drawn from prior FCC orders); *Dominguez v. Yahoo!, Inc.*, No. 13-1887, 2017 WL 390267, at *19 (E.D. Pa. Jan. 27, 2017) (ruling that Snyder's opinions were unreliable).

In this case, Snyder's opinions regarding whether the EZ Texting platform is an ATDS are neither relevant nor material because they are predicated on prior FCC orders that were struck down a week after he served his expert report. In *ACA Int'l v. FCC*, No. 15-1211, __F.3d__, 2018 WL 1352922 (D.C. Cir. Mar. 16, 2018), the D.C. Circuit vacated FCC rulings that impermissibly expanded the definition of ATDS, thereby leaving intact the plain terms of the statutory definition under 47 U.S.C. § 227(a)(1). 2018 WL 1352922, at *8-9.[1] The opinions in Snyder's report do not establish that the EZ Texting platform is an ATDS based on the statute, which defines and ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Rather, Snyder's conclusion that the EZ Texting platform is an ATDS is derived from the simplistic premise that all computerized platforms and software

---

[1]     *See also Marshall*, 2018 WL 1567852, at *5 ("In light of this ruling [in *ACA Int'l*], the Court will not stray from the statute's language . . . ."). *ACA Int'l* does not disturb case law holding that a system which requires "human intervention" to send a text message is not an ATDS, which the FCC was aware of but did not overrule. 2018 WL 1352922, at *12.

programs can be modified to add code to perform random and sequential number generation—a generalization that would apply to all smartphones and devices that run on a computerized operating system. Snyder Decl. [Dkt. 83-1] ¶ 86. *ACA Int'l* rejected that very argument by holding invalid the FCC's 2015 construction of "capacity" to include an equipment's ability to acquire ATDS functionalities through modifications, including software changes, ruling it "untenable" to construe "capacity" in a manner that would encompass smartphones, "the most ubiquitous type of phone equipment known . . . ." 2018 WL 1352922, at *7. Snyder's opinion that the EZ Texting platform "require[s] only a few dozen lines of software code" to give it the requisite random or sequential number generation function, is therefore irrelevant and inadmissible because it is based on an unauthorized expansion of the statutory definition of an ATDS.

In an attempt to salvage his conclusion that the EZ Texting platform had the existing (unmodified) capacity to generate random or sequential phone numbers, Snyder offered for the first time a new premise at his April 3 deposition—that any computer used to access EZ Texting's web-based application downloads an Excel spreadsheet with a Rand() function that, if programmed by a user, can generate a random list of numbers. **Exhibit 1**, (Transcript of the April 3, 2018 deposition of Randall A. Snyder ("Snyder Tr.")) at 10:12-12:19.[2] This theory, which depends on finding that the "system" at issue includes the user's computer and the Microsoft Excel program, fails for multiple reasons.

First, *ACA Int'l* held that the FCC could not expand the statutory definition of an ATDS to include "dial[ing] from an externally supplied set of numbers" (such as Excel) "even if it has no capacity itself to generate random or sequential numbers," because it contradicted other FCC pronouncements that an ATDS must *itself* be capable of generating random or sequential numbers. 2018 WL 1352922, at *11.

Second, Snyder admits he did not test the system to actually try to dial phone numbers randomly or sequentially generated using the Rand() function in Excel, and could not even write the few lines of code he opines would take only a "few minutes" to demonstrate this functionality, even though six hours remained in the deposition and he had access to a computer with Excel, and he testified it was "very basic" to do this (despite that he had never written code

---

[2]      Snyder conceded at his deposition that his specific opinion regarding the Rand() function was not addressed in his expert report. *Id.* at 13:8-14:8.

for any text messaging system and had not written code of any type since 1992). Snyder Tr. at 12:21-24, 50:23-52:23.

Third, Snyder's overbroad definition of "system" is unsupported by any peer-reviewed or generally accepted standards (let alone any case law), and he contends that his opinions regarding the Rand() function (which are not even accurate, *see* **Exhibit 2**, (April 10, 2018 Declaration of Amir Doron ("April 10 Doron Decl.")) ¶¶ 6-7) do not involve any expertise at all—indeed, Snyder does not even consider his opinions to require any expertise because he claims any lay person who has used Excel can reach the same conclusion. Snyder Tr. at 13:2-7 ("The softwares that exist today have the same function and could easily generate random numbers from – you don't have to be a software engineer. You don't have to be a coder. You don't have to have a background in computer science."). Snyder's testimony about the RAND function is therefore irrelevant, unreliable, and improper because the ability to generate 10-digit numbers using Excel, which Snyder fails to show can programmed to send text messages, is not probative of whether the EZ Texting platform is an ATDS.

There is also no sound basis for Snyder's opinion that random number generation used in *encryption* technology (Snyder Decl. ¶ 88) supports his conclusion that the EZ Texting platform had the capacity to generate and dial random *telephone numbers*.  Indeed, he admits that random number generation used to encrypt data is "completely different" from number generation for sending text messages. Snyder Tr. at 70:8-14. His opinion on encryption technology is completely irrelevant and proposes a procedure as impractical as it is speculative.

In addition, Snyder's conclusion that the EZ Texting platform dialed numbers without human intervention (Snyder Decl. at 14) is a disguised legal opinion based on a narrow interpretation of FCC orders that Snyder admits run counter to known case law applying a broader standard. Snyder Tr. at 132:12-133:2. His analysis also fails to draw any meaningful distinctions between the sending of text messages via a mobile device, which he concludes involves human intervention because messages allegedly are transmitted instantaneously when a human presses the send button, and messages sent via the EZ Texting platform, which he concludes lacks human intervention because messages are allegedly "throttled" to avoid overloading carrier networks. There is no legal significance for this distinction because unless one is using a rotary or touch-tone phone, the act of dialing is always performed by a machine, and texts sent by smartphones are often delayed. *See* April 10 Doron Decl. ¶ 15 ("All modern

3

phones run operating systems. . . . The request by the human is queued up and the operating system always decides when to execute an operation requested by the user."). Moreover, Snyder's opinions about "throttling" are not based on his own inspection of the EZ Texting platform or the underlying technical documentation (which he did not review), but on assumptions drawn from other cases involving different platforms, where he was a proffered expert. *See* § II(C), *infra*. Accordingly, Snyder's conclusion that the delay in the sending of text messages caused by "throttling" renders the EZ Texting platform an ATDS, lacks any legal or evidentiary justification, and should be excluded.

Lastly, Snyder's conclusion that the class is ascertainable is wholly unsupported and he lacks the qualification to opine on this issue. He performed no analysis of the class. Nor did he test his hypotheses that phone numbers and subscriber information can be "cross-referenced" through sources he himself has not reviewed. Snyder's methodology is simply parroted from information he received from the Class Experts Group, a vendor to class action plaintiffs, and are not his own expert opinions (and he did not even check his views with Class Experts Group). *See* § III, *infra*; **Exhibit 3**, Expert Declaration of Dr. Debra J. Aron ("Dr. Aron Decl.").

In sum, Snyder's proposed expert opinions fall well below the standards of admissibility imposed by Rule 702 and should be excluded.

## MEMORANDUM OF LAW

### I.    Legal Standard

The trial court determines preliminary questions regarding the admissibility of expert witness testimony and evidence. *See* Fed. R. Evid. 104(a); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). The proponent of an expert's proposed testimony bears the burden of establishing its admissibility. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592, n. 10.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Expert testimony is only admissible when the: (1) the expert is qualified to testify competently; (2) the methodology used by the expert to reach his or her conclusion is sufficiently reliable as determined under the *Daubert* standard; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to under the evidence or to determine a fact in issue. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

To assess reliability, a district court may consider "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." *McDowell v. Brown,* 392 F.3d 1283, 1298 (11th Cir. 2004).

The third prong—helpfulness, or fit—"goes primarily to relevance." *Id.* at 591. "The 'basic standard of relevance ... is a liberal one,' but if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.,* 582 F.3d 1227, 1232 (11th Cir. 2009) (quoting *Daubert,* 509 U.S. at 587, 591–92).

## II. Snyder's Opinions Offered To Establish Use Of An ATDS Are Inadmissible Because They Are Unreliable, Irrelevant, And Constitute Improper Legal Conclusions

### A. Snyder's Opinions Are Based On Overbroad, Unsubstantiated Generalizations That Would Sweep In All Computerized Phone Systems, Including Smartphones

Snyder's conclusion that the EZ Texting platform had the requisite "capacity" to function as an ATDS is not based on any reliable methodology or inspection of the platform or code, but rather on his unverified assumption that the Rand() function in Microsoft Excel can be programmed to generate random or sequential numbers (which Snyder could not actually perform himself), and on his broad generalization that the ability to generate numbers "is a fundamental function inherent in information technology computer systems employing the most common operating systems, security protocols and encryption." Snyder Tr. at 12:21-24; Snyder Decl. ¶ 80. These premises, however, would render most (if not all) computerized texting platforms an ATDS, including common smartphones. Snyder, in fact, previously testified that an iPhone or an Android phone was "essentially an ATDS" and "was essentially used the same exact way as the EZ Texting system." Snyder Tr. at 66:13-67:3. But *ACA Int'l* has rejected any expansion of the statutory definition of ATDS that could be construed to encompass smartphones. 2018 WL 1352922, at *7. *ACA Int'l* also nullified any argument based on Snyder's conclusion that the EZ Texting platform had the requisite "capacity" to function as an ATDS because it (1) had the capacity to dial from a list of phone numbers, and (2) could be modified to generate phone numbers randomly or sequentially. *Id* at *7, 11; Snyder Decl. ¶¶ 13, 86. Neither of these premises address the criteria defined by the statute—the capacity to generate random or

5

sequential numbers, and to dial them.

Snyder opines that "the Defendants utilized equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, *or from a list or database of numbers*, and to dial such numbers without human intervention." Snyder Decl. ¶ 13 (italics added). Snyder's use of the disjunctive in a prior expert report using the same language was ruled as "misleading" by another district court. *Dominguez v. Yahoo!, Inc.*, 8 F. Supp. 3d 637, 643 (E.D. Pa. 2014) ("Mr. Snyder conveniently added the addition disjunctive phrase 'or from a list of telephone numbers' to his declaration—a phrase that appears nowhere in the statutory definition of an ATDS. . . . The inclusion of this additional phrase is misleading. . . . [and] renders Mr. Snyder's Declaration entirely unreliable on this point . . . ."), *vacated and remanded on other grounds*, 629 F. App'x 369 (3d Cir. 2015) (remanding for consideration of new regulations that issued while the case was on appeal).

In this case, Snyder's deposition testimony makes clear that his opinion that the EZ Texting platform has the capacity to generate random or sequential numbers depends on a lay person programming the Rand() function in Excel to generate 10-digit numbers, which he fails to substantiate on the basis of any reliable methodology. That opinion, which was not disclosed in his expert report, reflects an attempt to conform his opinions with the prevailing law construing the definition of ATDS after *ACA Int'l* (which changed a week after Snyder served his expert report). Snyder Tr. at 10:12-12:19. But his opinions are not probative of whether the EZ Texting platform has the requisite "capacity" under the statute, which requires both the capacity to generate and dial random or sequential phone numbers. *See* 47 U.S.C. § 227(a)(1); *Dominguez v. Yahoo!, Inc.*, 2017 WL 390267, at *20-21 (excluding plaintiff's experts who opined that the system could be modified to generate random or sequential numbers). Further, Snyder's expansive view that the "system" includes Excel is unsupported by evidence or any peer-reviewed standard or generally accepted principles. The EZ Texting platform does not depend on the use of Excel. *See* April 10 Doron Decl. ¶ 4.

Even if the Court accepts Snyder's overbroad definition of "system" to include external programs such as Excel—an argument *ACA Int'l* rejected in striking down FCC orders that construed ATDS to include "dial[ing] from an externally supplied set of numbers," 2018 WL 1352922, at *11—Snyder's opinion lacks any evidentiary support and is completely unreliable. Generating 10-digit numbers is not the same as generating *phone* numbers with valid area codes,

and Snyder does not explain how Excel can be programmed to generate *phone* numbers. April 10 Doron Decl. ¶ 9. Ultimately, Snyder's opinion that the EZ Texting platform has the requisite "capacity" is based on his generalized view that all operating systems have the "inherent" capability to generate numbers, rather than on an actual examination of the platform. Snyder Tr. at 22:14-19 (testifying that "random generator functions" are "inherent in the Excel program, . . . in the windows operating system, . . . whether JAVA is used or PHP or C++ in the language libraries that are used"). Indeed, Snyder could not identify a texting system that does not have the capacity to generate numbers randomly or sequentially, *id.* at 41:14-42:7, 44:4-45:6, because in his view "[m]ost computer systems can generate random and sequential numbers," *id.* at 43:13-15. *See also id.* at 66:13-67:3 (conceding that mobile phones can upload numbers from Excel).

Snyder's opinion certainly was not (and could not have been) derived from observations he made while *using* the platform, because Snyder admitted he only used the EZ Texting web application to send text messages to four specific recipients whose numbers he manually inputted. *Id.* at 32:14-17. Snyder did not attempt to test whether he could send text messages to numbers that the EZ Texting platform itself generated randomly or sequentially. *Id.* at 32:18-23. He simply "did not choose" to do so—no doubt because the EZ Texting platform *cannot* be used to send text messages to randomly or sequentially generated phone numbers, as made clear in the EZ Texting declaration. *Id.* at 33:10-13 ("I assure you that even though I did not use the RAND function in the Excel spreadsheet, it performs that function and can be used that way. I just did not choose to use it that way.") and Dkt. 63-5 (February 21, 2018 Declaration of Jagannathan Thinakaran ("Feb. 21 Thinakaran Decl.")) at ¶ 23.

It was also proven at Snyder's deposition that he could not write the algorithm to generate random or sequential phone numbers, despite having testified that he "could do it, and it would probably take a few minutes." *Id.* at 50:10-22. Snyder gave repeated assurances:

> Q. . . . Could you write the functionality to generate numbers randomly?
> A. Yes.
> Q. So random ten-digit phone numbers that could be dialed?
> A. Sure.
> Q. And also sequential numbers that could be dialed? . . .
> A. Yes. In fact, it's very basic to generate numbers using any arithmetic incremental algorithm in Excel, whether you want to go odd numbers, even numbers, by twos, threes, fours, or by one.

*Id.* at 50:23-51:11. But when asked to demonstrate this, Snyder literally turned up blank.

Q. . . . So I'm going to mark as Exhibit 5 a blank paper. And I will give that to you along with a pen. . . .

Q.  If you could please write the functionality that would be required using the RAND function so that the EZ Texting system would be able to generate numbers randomly or sequentially.

A.  I don't have that memorized, the algorithm memorized.

Q.  Okay. What would you need to do that?

A.  Simply bring up Excel, and I would use the RAND function, and probably within a few minutes have the right method of characterizing the parameters to do it. Again, very, very basic thing to do.

Q.  Do you have a laptop here with you?

A.  I do not.

[Objection by plaintiff's counsel.] . . .

Q.  I have a computer here. Tell me what you need to look at in order to be able to write this functionality on Exhibit 5 . . . .

A.  I'm not prepared to do a homework here. I'm prepared to defend my expert report. I could tell you I am very confident I could do it. I'm just not prepared to start using computer systems here in this deposition.

*Id.* at 51:12-52:23.

While Snyder contends that any layperson could use the Rand() function in Excel to send text messages to random or sequential numbers via the EZ Texting platform, *id.* at 53:9-16, his apparent inability to demonstrate this on the record—whether in his report or at his deposition—proves that his opinions are specious. *See id.* at 53:5-56:6 (additional testimony demonstrating Snyder's inability and refusal to write the algorithm underlying his opinion within the remaining 6 hours of his deposition). In fact, a lay person without a computer science degree or similar training likely would not know how to program Excel to generate random 10-digit phone numbers. *See* April 10 Doron Decl. ¶ 4. What is clear, however, is that *Snyder* lacks this expertise and should be excluded from offering testimony on this matter.

Nor could Snyder substantiate his opinion that "the respective software procedures to generate either random or sequential numbers are simple, basic, and require only a few dozen lines of software code at most, including error protection and writing these generated numbers into a file or queue to be dialed automatically" (Snyder Decl. ¶ 86), which he admitted he did not actually do in this case, and in fact has never done it in the context if a texting system. Snyder Tr. at 83:12-25; *see also id.* at 75:21-77:23 (refusing again to write out those few lines of code on blank pages marked as Exhibit 6, even though he testified he could "write some lines of code that would generate ten-digit numbers"). He also fails to show how such numbers can be dialed.

The reason for these shortcomings is simple: Snyder cannot prove the validity of his

opinions because (1) he is unqualified, and (2) it cannot be done.

Snyder admits he has never written any code to operate a text messaging system and indeed has not written any code at all since 1992 – more than 26 years ago. *Id.* at 78:14-23, 80:6-7, 83:12-25. His inability to verify his opinion that any lay person can program the Rand() function in Excel to generate 10-digit numbers, not only renders his opinion unreliable, but underscores he is unqualified to opine on how to program Excel or write code for any software program.

Snyder also ignored material evidence confirming that EZ Texting lacks the capacity to generate random or sequential phone numbers. EZ Texting's declarant, the Chief Operating Officer of CallFire, which operates, owns and controls EZ Texting, made clear that the software "can only be used to send text messages to specific, identified phone numbers that were input into the platform by a customer," and "does not have the capacity to send messages to random or sequential phone numbers, or to send messages to sequential blocks of phone numbers." Feb. 21 Thinakaran Decl. ¶ 23. Snyder chose not to consider this evidence in his report, opting instead to attach a much less detailed declaration (*see* Dkt. 83-1 at 92 (February 27, 2018 Declaration of Jahannathan Thinkaran) that was later submitted by the same witness and which did not address this issue. Snyder Tr. at 138:9-20.

Further, Snyder did not analyze the developer APIs before he conceded that the documentation "probably doesn't have that functionality," and speculated the reason for the absence of that functionality in the APIs (which he did not verify) was because the purported number generation functionality is present in the Excel file. *Id.* at 35:14-36:4. But that is nonsense. The more logical inference for the lack of any documentation is that the functionality simply does not exist. *See also* April 10 Doron Decl. ¶ 10. Snyder also did not even attempt to confirm his view that "it would be extraneous for engineer to want to design that into [the back-end] system," because he did not to speak to anyone at EZ Texting, claiming they would be biased (and instead spoke almost exclusively with plaintiff's counsel). *Id.* at 36:21-37:1, 64:4-66:9.

Snyder's opinions simply lack any indicia of reliability. They are not based on his review of the software code, the API documentation, or any other technical materials underlying the EZ

Texting platform.[3] Snyder deigned those tasks unnecessary and irrelevant. Snyder Tr. at 25:1-10 (testifying that he merely "used" the platform but did not review any of the underlying code), 25:17-26:2 (stating "I don't have to look at the underlying code" because "the definition of an ATDS, within the TCPA, is functional in nature. It doesn't talk about specific programmatic code . . . or logic or certain internal operations that characterize an ATDS. . . ."), 31:16-20 (testifying that "[t]here was no need" for him to review the APIs for the EZ Texting platform). He also spent very little effort in preparing his opinions, which are virtually the same ones he peddles from one TCPA case to another (and from which he earns 100% of his income by recycling the same opinions irrespective of the platform at issue).[4] Here, at least half of his report was lifted from prior opinions about *other* platforms, not the one used in this case. *Id.* at 24:21-24. Snyder's invoices show he spent 18.3 hours for his work in this case, of which "several hours" were purportedly spent using the EZ texting platform, and included time he spent on "various calls" with plaintiff's counsel for "small tasks," such as finding out the correct phone number to a wrong number he dialed. *Id.* at 25:2-4, 26:22-27:9, 27:18-28:23. Undoubtedly Snyder spent time on tasks he considered too mundane to describe on discoverable records (*id.* at 27:12-24), but it is equally apparent that he did not do his "homework" in this case—indeed, Snyder could not even name or otherwise identify the operating system used by the EZ Texting app, which he did not inspect or verify. *Id.* at 67:23-68:14, 70:2-6.

Accordingly, Snyder's opinions are entirely unfounded, unreliable, and should be excluded. *See, e.g.*, *Legg*, 2016 WL 1767097, at *4-5 (excluding Snyder's opinions because they were improper legal conclusions and lacked adequate foundation); *Marshall*, 2018 WL 1567852, at *6-8 (excluding Snyder's opinions where he failed to analyze the platform at issue, and because his ultimate conclusion that it had the capacity to store or produce telephone numbers to be called using a random or sequential number was not supported by the premises he relied on).

---

[3]     *See Marshall*, 2018 WL 1567852, at *8 ("Courts have declined to allow expert testimony to create a disputed issue of material fact in TCPA cases where the expert in question has not examined the dialing infrastructure at issue.").

[4]     Snyder is nothing more than a hired gun. He testified that "100 percent of my career work today comes from expert witness testimony" (*id.* at 45:17-18); he has only represented a defendant in a TCPA case once within the past five years in a voice-calling case (*id.* at 46:9-24); and he has never testified, within the last 20 years, on behalf of any defendants in any texting case arguing that the system used was not an ATDS (*id.* at 47:12-21).

### B. Snyder Is Not Qualified To Opine On Encryption Technology, Which Is Irrelevant To This Entire Case

Snyder offers irrelevant opinions about encryption technology to conclude, without substantiation, that the EZ Texting platform had the capacity to generate random numbers. Snyder Decl. ¶ 77. Snyder came up with this novel theory in a prior TCPA case and was excluded. *Dominguez v. Yahoo!, Inc.*, 2017 WL 390267, at \*18. His opinion that encryption technology uses a random number generator likewise does not assist this Court in determining whether the EZ Texting platform had the capacity to generate and dial random *phone* numbers.

First, Snyder is not qualified to opine on the alleged use of encryption software to generate random telephone numbers. His expertise is allegedly in "telecommunications network and system architecture, engineering design and technology," and he does not purport to have any relevant expertise in encryption technology (indeed, he has not written code since 1992). Snyder Decl. ¶ 3. His opinions should be excluded on this basis alone. *See, e.g.*, *Guenther v. Novartis Pharm. Corp.*, No. 6:08-CV-456-ORL-31, 2013 WL 1278089, at \*2-\*3 (M.D. Fla. Mar. 28, 2013) (despite "find[ing] that [plaintiff's expert] [wa]s generally qualified," precluding expert from testifying on topic due to lack of "expertise required to analyze it"); *Leblanc v. Coastal Mech. Servs., LLC*, No. 04-80611-CIV, 2005 WL 5955027, at \*2 (S.D. Fla. Sept. 7, 2005) (recognizing this Court's prior exclusion of an expert who possessed no specialized knowledge or training in the relevant field of toxicology, despite being qualified in general discipline of medicine) (citing *Everett v. Georgia–Pacific Corp.*, 949 F. Supp. 856, 857 (S.D. Ga. 1996)).

Second, Snyder's opinions are unreliable and do not help the trier of fact. He admits that he reviewed "[v]ery little" information about EZ Texting's encryption security protocol. *Id.* at 80:24-81:1. He also concedes that random number generators used to encrypt data are "completely different" from number generation for sending text messages. Snyder Tr. at 70:8-14. He does not even opine that such random numbers (used for encryption) are generated in a format that can be dialed as *phone* numbers with valid area codes, and deems it unnecessary because he concludes that the platform will check the numbers "to see if they're valid, and kicks them out" if they are invalid. *Id.* at 72:11-22. But it would be impractical to design a platform where the majority of randomly generated numbers cannot be called because they are invalid. *See* April 10 Doron Decl. ¶ 9. There is absolutely no correlation between encryption technology

and random generation of *phone* numbers. Snyder's opinions therefore do not "fit" the issues raised in determining whether the EZ Texting platform is an ATDS, and should be excluded.

### C.  Snyder's Opinions About Whether The EZ Texting Platform Sends Messages Without "Human Intervention" Are Disguised Legal Opinions

Snyder's conclusion that the EZ Texting platform qualifies as an ATDS under the "human intervention" analysis reflects a legal opinion about which type of functionalities are material to this standard. The human intervention test is judge-made law,[5] and has been construed by courts in the Eleventh Circuit. *See, e.g.*, *Martin v. Allied Interstate, LLC,* 192 F. Supp. 3d 1296, 1308 (S.D. Fla. June 17, 2016) (granting summary judgment for the defendant where calls were placed manually); *Gaza v. LTD Fin. Servs., L.P.,* No. 8:14-CV-1012-T-30JSS, 2015 WL 5009741, at *1, 4 (M.D. Fla. Aug. 24, 2015) (granting summary judgment for the defendant where the court found that the calls were "made as a result of human intervention").

Snyder's opinions are improperly offered as a substitute for the Court's judgment on the law. He contends that "human intervention" focuses only on the "dialing" aspect of the platform, and that the multiple manual steps leading to up to the point of actual transmission of the text message (including the inputting of phone numbers, creation of the message, the selection of recipients, etc.) are irrelevant to this analysis. *See* Snyder Decl. ¶¶ 40-48. The basis of his opinion is his interpretation of FCC regulations that have been set aside by *ACA Int'l*. Snyder Tr. at 87:4-8, 131:20-132:5. Snyder acknowledged he was aware of court decisions "that have described human intervention differently" from how he uses the term, and that he applied a narrower definition in this case. *Id.* at 132:12-133:2. But that determination is not his to make. "It is axiomatic that experts may not offer opinions as to legal conclusions." *Spadaro v. City of Miramar*, No. 11-61607-CIV-COHN/SELTZER, 2013 WL 12090197, at *4 (S.D. Fla. Feb. 11, 2013) (Cohn, J.); *see also In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) (Middlebrooks, J.) (an expert's opinion that "regurgitates" facts and "reaches conclusory opinions that are purportedly based on [those] facts" is improper). District courts have excluded Snyder's ATDS opinions in other TCPA cases because they amount to "the legal

---

[5]  The human intervention argument is a judicial doctrine developed by courts in TCPA litigation of which the FCC was aware and chose not to disturb through regulation. *See In re Rules & Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8090 (2015) (O'Reilly, Comm'r, dissenting) (confirming that the FCC did not address the definition of "human intervention" and criticizing the majority for leaving it to courts through case law to address this doctrine).

definition of an automatic telephone dialing system, or the legal implications of [defendant]'s systems in relation to that definition . . . ." *Legg*, 2014 WL 1767097, at *4.

There is absolutely no basis to accept Snyder's opinion that a narrower definition of the "human intervention" standard should be applied to this case. This is a legal determination where courts have ruled contrary to Snyder's contention that all activities involved in setting up the text message and the parameters for the texting campaign, do not qualify as human intervention. *See, e.g., Luna v. Shac*, 122 F. Supp. 3d 936, 940 (N.D. Cal. 2015) (granting summary judgment for the defendant and ruling that the text message at issue was sent via the EZ Texting platform as a result of human intervention "in several stages of the process prior to Plaintiff's receipt of the text message, and was not limited to the act of uploading the telephone number to the CallFire database . . . . [H]uman intervention was involved in drafting the message, determining the timing of the message, and clicking 'send' on the website to transmit the message to Plaintiff."). Snyder's opinions on whether the EZ Texting platform lacks human intervention to render it an ATDS turns on *legal materiality*, not any specialized knowledge.

To underscore the impropriety of Snyder's proffered opinions, he even testified that "human intervention" is a "legal term that I don't quite know precisely what it means," but in the same breath claimed he "certainly know[s] what without human intervention means" and that it "refers to the act of dialing." Snyder Tr. at 98:14-20. "I don't really know what the definition of human intervention is. . . . What constitutes that human participation or agency, I don't know. The FCC has said they don't know and the courts have argued it for years now. What I can tell you is my definition is based on whether a machine dials or whether a human dials. . . . Now, what constitutes dialing with human intervention, I don't have a definition for that. I don't know what that means." *Id.* at 172:2-18. When asked how he can have an opinion that the EZ Texting system dials lists of numbers without human intervention when he does not know what human intervention means, Snyder replied: "Easily. I know what without human intervention means. I don't know what with human intervention means. And I know that without human intervention means the act of dialing can be performed without any human agency, any human activity, any human participation." *Id.* at 174:3-12.

Moreover, Snyder's conflicting testimony, claiming that "without human intervention" is defined but that the corollary "with human intervention" is undefined, demonstrates that Snyder's opinions on this issue are neither helpful nor reliable. There is no peer-reviewed or

generally accepted principle behind his conclusion that "[a]ll activities besides dialing, in my view, is not dialing with human intervention or without human intervention." *Id.* at 158:13-15. That is simply Snyder's personal (hired) view.

Indeed, Snyder provides no meaningful distinction between peer-to-peer messaging (i.e., person to person, mobile to mobile), which he concludes always involves human intervention, and messages sent via the EZ Texting platform. *Id.* at 85:9-23. He states that "[i]n peer-to-peer messaging, the act of dialing is contemporaneous, and the human controls the timing of the initiation of the message. In the EZ Texting system, you need to import a telephone number, you need to create a text message, and then the system goes through a detailed software process of verifying those numbers, and then through CLX it checks who the carrier is. All these other systems come into play. And the system itself is determining when to transmit the message, not the person setting up the program such that the parameters are input to transmit the message." *Id.* at 88:20-89:6. But the steps Snyder describes in his report illustrate that when using the EZ Texting platform, Snyder was required to manually insert phone numbers, compose the message, select the recipients, and schedule the date and time to transmit the message. Snyder Decl. ¶¶ 39, 42-48. In both scenarios, human agency drives these processes. *See* April 10 Doron Decl. ¶¶ 13-16.

Snyder also admits smartphones can also send "hundreds or thousands" of messages (Snyder Tr. at 108:15-24) and can schedule text messages (*id.* at 109:13-110:8), but maintains that texting via smartphones is different from texting through the EZ Texting platform because of the "throttling" factor which delays the transmission of text messages after a person clicks the send button by "up to a couple of milliseconds." *Id.* at 110:9-17; 148:12-22. Snyder rejects EZ Texting's testimony that messages can be sent via the platform "immediately, in real-time" (Feb. 21 Thinakaran Decl. ¶ 20; *id.* at 139:11-25), and contends that because the third-party aggregator "throttles" the messages, the "system" itself is automatically sending the text messages without human intervention. Snyder Decl. ¶ 53. The alleged distinction is based solely on Snyder's unsubstantiated personal opinion that "dialing has to be contemporaneous with the initiation of a message," and here, the "system" (as opposed to a person) "determines when to initiate the message for a variety of reasons, whether you said a schedule or whether there's internal traffic management," which "doesn't occur on a personal and manual use of text messaging on a phone." Snyder Tr. at 157:15-22. Instead, Snyder explains that the delay in text message delivery

14

via cell phones (versus EZ Texting's platform) is caused by the reception of a message, not the transmission which "is almost never delayed." *Id.* at 148:23-149:4. These are distinctions without a difference. *See* April 10 Doron Decl. ¶¶ 13-17.

Regardless of whether those alleged differences are real or simply semantics, Snyder's opinions are inherently unreliable. His opinion that "the EZ Texting system must throttle and, therefore, the messages may be delayed by milliseconds" is based on information produced in a case he testified against a different platform provider, Twilio, and not on any documentation in this case suggesting that this actually happens with EZ Texting. Snyder Tr. at 144:19-148:146:4. Snyder also did not test or independently verify his purported opinion, and merely speculated that if he tested the system the way he did but used 10,000 numbers instead of the four he actually used, not all messages would be transmitted at the same time. *Id.* at 154:7-15. He does not have any personal knowledge of these facts (*id.* at 155:4), and cannot point to any documentation or scholarship or methodology he relied on for his opinion that a potential delay of up to a couple of seconds does not constitute "real-time" transmission (*id.* at 156:4-13).

Snyder's opinions regarding human intervention are therefore inadmissible.

**III.**   **Snyder's Proffered Opinions On Ascertainability Are Not Based On His Own Work And Do Not Assist The Trier Of Fact**

Snyder's conclusory opinions "on whether identifying the contact information can be ascertained based solely on a telephone number and at the time that telephone number was called," are wholly unsubstantiated. *See* Snyder Decl. ¶¶ 89-95; Snyder Tr. at 186:25-187:3.

Snyder is not himself the expert – he claims to have borrowed the purported methodology stated in paragraph 90 of his report from the Class Experts Group, a vendor to plaintiffs' class action counsel that he knows from other cases. Snyder Tr. at 182:15-183:5 ("I'm not an expert in public database analysis . . . . However, this is the methodology I've been personally involved with working side by side with these data analysis on how to determine and filter telephone numbers for class definitions and class actions."), 188:1-4 (admitting that his methodology of ascertainability was based on the expertise of Class Experts Group, not his own purported expertise). Snyder asserts that "the methodology that they use, I worked side by side with them on many cases over the last five, six or seven years. And this has been demonstrated to me to be viable and empirically sound." 188:4-8. In other words, Snyder merely parrots what he observed as a lay witness while working next to Class Experts Group in *other* TCPA cases, not this case.

*See Legg*, 2016 WL 1767097, at *3 (excluding Snyder's opinion regarding the size of the proposed class "because it draws upon no special expertise").

It is improper for Snyder to vouch for Class Action Group's methodology. Snyder did not verify his opinions with Class Action Group and admits that "I have not performed this technique myself." *Id.* at 190:5-8. He does not know whether the methodology used by Class Experts Group—which has not been performed in this case—is peer reviewed by any industry or academic group. *Id.* at 204:6-9. The Class Expert Group's cross-referencing methodology is not based on any independent verification by Snyder, but by what Class Expert Group has told him – "they've relayed to me and the cases I've worked on is they have somewhere between a 90 and 95 percent hit rate of actually notifying the correct people that were called in TCPA cases in a class action." *Id.* at 194:20-25. "I've personally worked with the people that have derived this information and testified to it and I've read their reports. And I've worked with them to obtain this. No I have not performed the analysis myself . . . ." *Id.* at 214:4-9.

His opinions are fundamentally flawed because he does not even analyze the complications imposed by phone number reassignment, which Dr. Debra Aron explains in her report creates significant impediments to ascertainability. Dr. Aron Decl. ¶¶ 23-25. Snyder maintains that "[t]he fact that numbers have been reassigned is of no consequence to whether a given cellular telephone number was called on a specific date or was texted a message by the system at a specific date in the past." Snyder Tr. at 191:25-192:4. However, the phone numbers in this case are up to eight years old, and the "frequency with which Americans change telephone numbers is therefore highly relevant to the facts of this case" because it directly impacts the accuracy of the class. Dr. Aron Decl. ¶ 23. But Snyder did not review the call logs and does not even know what time period is at issue. Snyder Tr. at 206:18-207:14. He therefore cannot competently opine on the success rate or viability of his proposed methodology to ascertain the class, or otherwise conclusively say that the class can be ascertained to any degree of certainty.

## CONCLUSION

For the foregoing reasons, Pandora respectfully requests that this Court exclude Snyder from serving as an expert witness in this case, in accordance with Fed. R. Evid. 702.

Dated: April 12, 2018                Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
333 SE 2nd Avenue
Miami, FL  33131
Telephone:  (305) 579-0500
Facsimile:   (305) 579-0717

By:     */s/ Ian M. Ross*
        HILARIE BASS
        Florida Bar No.  334323
        bassh@gtlaw.com
        IAN M. ROSS
        Florida Bar No.  091214
        rossi@gtlaw.com
        FLService@gtlaw.com
        MontelH@gtlaw.com


**GREENBERG TRAURIG, LLP**
1840 Century Park East
Suite 1900
Los Angeles, CA  90067
Telephone:  (310) 586-7700
Facsimile:   (310) 586-7800
IAN C. BALLON
*Admitted pro hac vice*
ballon@gtlaw.com
NINA D. BOYAJIAN
*Admitted pro hac vice*
boyajiann@gtlaw.com

*Attorneys for Defendant, Pandora Jewelry, LLC*


## LOCAL RULE 7.1(A)(3) CERTIFICATE OF GOOD FAITH CONFERENCE

I hereby certify that counsel for Pandora (Ian M. Ross, Esq.) met and conferred with counsel for Plaintiff (Scott Edelsberg, Esq.), on April 9, 2018 via email in an effort to resolve this dispute without Court intervention, but the Parties were unable to agree.

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 12, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Scott A. Edelsberg, Esq.
Jeff Ostrow, Esq.
**KOPELOWITZ OSTROW FERGUSON**
**WEISELBERG GILBERT**
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: 954-525-4100
Fax: 954-525-4300
kaufman@kolawyers.com
edelsberg@kolawyers.com
ostrow@kolawyers.com
*Counsel for Plaintiff*

Manuel S. Hiraldo, Esq.
**HIRALDO P.A.**
401 E. Las Olas Blvd., Suite 1400
Fort Lauderdale, Florida 33301
Tel: 954-400-4713
mhiraldo@hiraldolaw.com
*Counsel for Plaintiff*

Andrew J. Shamis, Esq.
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 400
Miami, Florida 33132
Tel: 305-479-2299
ashamis@shamisgentile.com
*Counsel for Plaintiff*

Ian C. Ballon, Esq.
Ian M. Ross, Esq.
Nina D. Boyajian, Esq.
Hilarie Bass, Esq.
**GREENBERG TRAURIG, P.A.**
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Tel: (305) 579-0500
Fax: (305) 579-0717
bassh@gtlaw.com
boyajiann@gtlaw.com
rossi@gtlaw.com
ballon@gtlaw.com
*Counsel for Defendant Pandora Jewelry, LLC*

/s/ *Jeffrey B. Pertnoy*
Jeffrey B. Pertnoy, Esq.

18