UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-62100-CIV-MORENO/SELTZER

KATIRIA RAMOS,
individually and on behalf of all
others similarly situated,

       Plaintiff,

vs.

HOPELE OF FORT LAUDERDALE, LLC
d/b/a PANDORA@GALLERIA, a
Florida limited liability company, and
PANDORA JEWELRY, LLC, a Maryland
limited liability company,

       Defendants.
_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** has come before the undersigned upon the Order [DE 40] referring all pre-trial matters to the Magistrate Judge for appropriate disposition or recommendation pursuant to 28 U.S.C. § 636(b)(1)(A).  The parties have each filed motions for summary judgment, which are fully briefed.  Also pending are Plaintiff's Motion for Class Certification and the Defendants' respective Daubert motions seeking to strike the testimony of Plaintiff's expert, Randall Snyder.   For the reasons that follow, the undersigned recommends that Plaintiff's Motion for Summary Judgment be denied, that Defendants' Motions for Summary Judgment be granted, and that the class certification and Daubert motions be denied as moot.

I.      BACKGROUND

    A.      Procedural History

    This is an action for damages brought under the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 et seq. (the "TCPA").  In pertinent part, the TCPA prohibits any person from using an automatic telephone dialing system ("ATDS") to call a cellular phone absent an emergency or prior express consent.  47 U.S.C. § 227(b)(1)(A)(iii).  Each TCPA violation results in damages of no less than $500, which may be trebled for willful or knowing violations.  47 U.S.C. § 227(b)(3)(B)-(C).  A text message is deemed a "call" under the TCPA.  Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1305 (11th Cir. 2015).

    Plaintiff, Katiria Ramos ("Ramos"), filed a Class Action Complaint [DE 1] on behalf of herself and all others similarly situated against Defendants Hopele of Fort Lauderdale, LLC, d/b/a Pandora@Galleria ("Hopele") and Pandora Jewelry, LLC ("Pandora") seeking injunctive relief and damages arising from a text marketing campaign conducted by Hopele.  According to the Complaint, Hopele sent Ramos two text messages on October 19, 2017, advertising a weekend sale at the Galleria store without obtaining Ramos' prior express consent, in violation of the TCPA.   Ramos alleges that Pandora is vicariously liable for the actions of Hopele on the ground that Hopele was acting as Pandora's agent or with apparent agency in sending the marketing texts.  Finally, Ramos alleges that Defendants willfully and knowingly violated the TCPA.  Ramos has filed a Motion for Summary Judgment [DE 70], as have Hopele [DE 62] and Pandora [DE 19].

    Ramos argues that the texting platform used by Hopele was, as a matter of law, an ATDS in violation of the TCPA and that Hopele acted as Pandora's agent, thereby

subjecting Hopele and Pandora to TCPA liability.  Hopele argues that it is entitled  to summary judgment because the web-based texting platform it used does not meet the statutory definition of an ATDS and, additionally, that Ramos lacks standing under the TCPA because the receipt of a single text message did not cause an injury-in-fact.  Finally, Pandora argues that its relationship with Hopele is that of franchisor/franchisee for which no vicarious liability attaches and that the texting platform utilized by Hopele was not an ATDS.  Thus, the issues for the Court to determine on summary judgment are:  (1) whether the texting platform used by Hopele was, as a matter of law, an ATDS; (2)  whether Ramos has standing to bring an action under the TCPA; and (3) whether Hopele acted an agent of Pandora.

B.    Undisputed Facts

Pandora designs, manufactures, and sells its own brand of jewelry products. Pandora owns and operates approximately 100 locations in the United States and has over 80 franchisees with approximately 300 locations nationwide.  Hopele is a franchisee of Pandora that operates a retail establishment selling Pandora jewelry at The Galleria in Fort Lauderdale, Florida.  In 2014, Ramos made a purchase at Pandora Galleria and completed a warranty information card in which she provided her name, address, and cell phone number.  The card did not contain a written consent to automated text messages.

1.    The text messages

When Plaintiff – and other customers– provided contact information to Hopele at The Galleria store, Hopele employees logged the customers' information into the point of

sale system utilized by Pandora franchisees, known as KWI.[1] Hopele also stored contact information obtained from customers through its own store website and from Pandora credit card applications on the KWI system.  Hopele used the customer phone numbers stored on the KWI system to conduct its text messaging campaigns.

Hopele's first text message campaign took place in June 2016.  In all, Hopele conducted 9 text message campaigns, but Plaintiff's Complaint refers only to the October 19, 2017, campaign, when Ramos received a text notification from Hopele of an upcoming sale at Pandora Galleria.[2]  Hopele's text campaigns were conducted by using a platform known as EZ-Texting, which is a web-based software application that is owned and controlled by a company known as CallFire.  CallFire does not control the content, destination, or timing of its customers' text messages.

Hopele's managing member, David Pentecost ("Pentecost"), designed and implemented Hopele's text marketing campaigns, including the October 19, 2017 campaign at issue in this matter. [DE 63].  To send a text, Pentecost signed into the KWI system using his username and password.  He then created a list of customer phone numbers

---

[1] Plaintiff has failed to rebut Hopele's 36-paragraph Statement of Undisputed Facts [DE 63], which are supported by evidence in the record.  Hopele's Statement of Undisputed Facts therefore, are deemed admitted.  See Cargo Airport Servs., USA, LLC v. Transcarga Int'l Airways, C.A., Inc., 2017 WL 4898292, at *3 (S.D. Fla. Oct. 27, 2017) (Moreno, J.) (citing Pompano Helicopters, Inc. v. Westwood One, Inc., 2009 WL 1515276, at *1 (S.D. Fla. May 29, 2009) (deeming all facts in motion for summary judgment admitted where non-movant did not specifically respond, paragraph by paragraph, with corresponding numbers as required by Local Rule 56).

[2] The parties dispute whether Hopele sent 1 or 2 text messages on October 19, 2017.  They also dispute whether Hopele sent 15,785 or 31,570 text messages on that day.  These disputes are not material to the issues raised in the Motions for Summary Judgment.

based upon various criteria such as the customer's date of purchase, minimum amount spent, and South Florida address.  After creating the list of customers to contact, he scrubbed the list of landline phone numbers (using another website known as www.searchbug.com and uploaded an Excel spreadsheet of the selected cell phone numbers into the EZ-Texting website.  Pentecost then wrote the text message that he wished to send, selected a date and time in the future to send the text message, and clicked on the "send" button to give final confirmation of the message, the date and time of delivery, and the cell phone numbers scheduled to receive the text message.

    2.    <u>The franchise agreement.</u>

Hopele is a franchisee of Pandora that entered into a franchise agreement to develop and operate a Pandora store at The Galleria Mall in Fort Lauderdale, Florida.  The agreement specifies that Hopele is an independent contractor and that neither party is the agent, legal representative, partner, subsidiary, joint venture, or employee of the other. Pursuant to the franchise agreement, Pandora authorized Hopele to use the Pandora trade name in advertising and marketing materials.  Hopele was required to, and did, hire a manager who devoted full attention to the general management and the day-to-day operations of the store.  The store's signage, layout, and fixtures were to be equipped according to Pandora's specifications.  Hopele's inventory was prescribed by Pandora, and Pandora retained the right to set the minimum and maximum prices at which Hopele could sell the merchandise.  Hopele was required by the franchise agreement to spend a certain percentage of its gross sales on local marketing, and to participate in, and contribute financially to, cooperative regional marketing campaigns.  Hopele was required to participate in all promotional and marketing activities designated by Pandora and was

required to get pre-approval for other advertising and promotional material that it wished to use.  Hopele, however, did not seek or obtain prior approval from Pandora for the text marketing campaign conducted by David Pentecost.

## II.   RELEVANT LAW

### A.   Legal Standards for Summary Judgment

Summary judgment is authorized where there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157(1970). The nonmoving party may not simply rest upon mere allegations or denials of the pleadings, but must establish the essential elements of its case on which it will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The nonmovant must present more than a scintilla of evidence in support of its position.  A jury must be reasonably able to find for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). In deciding a summary judgment motion, the Court must view the facts in the light most favorable to the nonmoving party. Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  The Court's function at this stage is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

### B.   The TCPA

The TCPA makes unlawful  "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . unless such call is made solely to collect a debt owed to or guaranteed by the

6

United States."  47 U.S.C. § 227(b)(1)(A).  An "automatic telephone dialing system"

("ATDS") is defined as "equipment which has the capacity –- (A) to store or produce

telephone numbers to be called, using a random or sequential number generator; and (B)

to dial such numbers." 47 U.S.C. § 227(a)(1).  The primary issue in the parties' respective

for summary judgment motions is whether Hopele used an "automatic telephone dialing

system" in violation of the TCPA.[3]

Congress has given the Federal Communications Commission ("FCC") the authority

to issue interpretive rules pertaining to the TCPA.  See e.g., 47 U.S.C. § 227(b)(2)

(directing the FCC to "prescribe regulations to implement the requirements of this

subsection").  "The Eleventh Circuit has unequivocally held that final FCC orders are

_____

[3] The parties raise other issues that are not implicated by the undersigned's findings in this Report.  For example, Pandora's Motion for Summary Judgment focuses on the issue of its vicarious liability for the text messages sent by Hopele.  The undersigned concludes that there are genuine issues of material fact as to whether Hopele acted as Pandora's agent. See West v. LQ Mgmt., LLC, 156 F. Supp. 3d 1361, 1370 (S.D. Fla. 2015).  However, in light of the undersigned's recommendation that summary judgment be granted for Defendants on the issue of Hopele's use of an ATDS, it is not necessary for the Court to rule on the issue of Pandora's vicarious liability.

In addition, Hopele argues that Plaintiff lacks standing because she has not sustained an injury in fact by her receipt of one (or two) text messages, as required by Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1549 (2016).  In Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245 (11th Cir. 2015), the Eleventh Circuit held that a one-page fax advertisement was a cognizable, particularized, and personal injury under the TCPA sufficient to confer Article III standing.  Even though Palm Beach Golf pre-dated Spokeo, Judge Gayles has ruled that Palm Beach Golf is binding on this Court and, thus, conferred TCPA standing upon a plaintiff who received one text message. Salcedo v. Hanna, 2017 WL 4226635, at *1 (S.D. Fla. Jun. 14, 2017) (certifying order finding standing under TCPA to the Eleventh Circuit for interlocutory appeal).  The facts in Salcedo are identical to those in this case.  The undersigned, moreover, concludes that Plaintiff has standing under the TCPA to pursue her claim.

binding on district courts and that district courts 'may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation[.]'"   Reyes v. BCA Financial Services, Inc., 2018 WL 2220417, at *6 (S.D. Fla. May 14, 2018) (quoting Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1307 (11th Cir. 2015)).   The FCC's interpretations have changed over the years as dialing technology has evolved.  In Reyes, Magistrate Judge Goodman explored the evolution of the FCC's definition of an ATDS.  Although the Reyes case involved a predictive dialer[4] – and this case does not –  the FCC Orders are important to the parties' analyses in this case, and, therefore, are discussed at length herein.

C.     The FCC Rules

1.     The 2003, 2008, and 2012 Orders

In 2003, the FCC issued an Order that  predictive dialers fall within the meaning and statutory definition of an ATDS.   In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14093 (2003) (the "2003 Order").  "When the TCPA was passed, telemarketers used dialing equipment to create and dial arbitrary 10-digit phone numbers." Jenkins v. mGage, LLC, 2016 WL 4263937, at *4 (N.D. Ga. Aug. 12, 2016).   "Around the turn of the century, however, it became much more cost effective for the teleservices industry to use lists of numbers."  Id. (citing the 2003 Order, at 419005).  The FCC explained that "in most cases, telemarketers program the numbers

---

[4] A predictive dialer is "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call."  Reyes, 2018 WL 2220471, at *5 (quoting In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14093 (2003)).

to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.  The principal feature of predictive dialing software is a timing function, not number storage or generation."  2003 Order, at 14091 (internal citations omitted) The FCC ruled that even though predictive dialers dial using lists of numbers, "[t]he basic function of such equipment . . . has not changed – the *capacity* to dial numbers without human intervention."  Id. (as quoted in Reyes, at *6) (emphasis added).

In 2008, the FCC reiterated its position that a predictive dialer is an ATDS and is subject to the TCPA.  Reyes, 2018 WL 2220417, at *6 (citing In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 FCC Rcd. 559, 566 (2008) (the "2008 Order")).  And again in 2012, the FCC stated that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists."  Reyes, 2018 WL 2220417, at *6 (quoting In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 15391, 15399 (2012) (the "2012 Order")).

Courts have interpreted the FCC's 2003, 2008, and 2012 Orders to mean that "a system can qualify as an ATDS even if it does not 'create and dial 10-digit telephone numbers arbitrarily' but rather 'relies on a given set of [phone] numbers.'" Ammons v. Ally Financial, Inc., 2018 WL 3134619, at *4 (M.D. Tenn. Jun. 27, 2018) (quoting Maddox v. CBE Group, Inc., 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018)).  The capacity requirement is met if the system had the ability to dial numbers without human intervention, even if that ability was not utilized to make the calls at issue.  King v. Time Warner Cable,

9

Inc., 894 F.3d 473, 481 (2nd Cir. 2018) ("[T]he TCPA applies to calls from a device that can perform the functions of an autodialer, regardless of whether it has actually done so in a particular case.").  Thus, various courts have noted that, ultimately, "the key feature of an ATDS is the capacity to dial numbers without human intervention." Pozo v. Stellar Recovery Collection Agency, Inc., 2016 WL 7851415, at *3 (M.D. Fla. Sept. 2, 2016) (quoting Wilcox v. Green Tree Servicing, LLC, 2015 WL 2092671, at *5 (M.D. Fla. May 5, 2015)); Ammons, 2018 WL 3134618, at *5; Reyes, 2018 WL 2220417, at * 10-12.  Judge Cohn of this District specifically found that the 2003 FCC Order applies "beyond the narrow circumstances of predictive dialers" and that an ATDS is defined by "the capacity to dial numbers without human intervention."  Legg v. Voice Media Group, Inc., 20 F. Supp. 3d 1370, 1375 (S.D. Fla. 2014).

## 2. The 2015 Order

In 2015, the FCC ruled "that an ATDS need only have the future capacity to dial random and sequential numbers, rather than the present ability to do so." Id. at *5 (citing In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961, 7974 (2015) ("the 2015 Order")).  Thus, the FCC expanded the concept of capacity "to encompass capabilities that could potentially exist with future modifications of software." See King, 894 F.3d 473.  Stated differently, the FCC "determined that the 'capacity' of calling equipment 'includes its potential functionalities' or 'future possibility,' not just its 'present ability.'" ACA Int'l v. FCC, 885 F.3d 687, 695 (D.C. Cir. 2018) (quoting the 2015 Order, 30 FCC Rcd. at 7974 ¶ 16).

D.    The ACA International Decision

The 2015 FCC Order faced challenges in various courts of appeal, challenges that were eventually consolidated before the D.C. Circuit Court of Appeals in ACA Int'l, 885 F.3d 687, 691.  In its March 2018 decision, the D.C. Circuit rejected the FCC's 2015 interpretation of "capacity" as unreasonably and impermissibly expansive:

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity?  The 2015 ruling, while speaking to the questions several ways, gives no clear answer (and in fact seems to give both answers).  It might be permissible for the Commission to adopt either interpretation. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

Id. at 702. Under the 2015 Order, a cell phone would have the potential capacity to be an ATDS with the addition of a dialing app, thus subjecting cell phone users to potential TCPA liability for group texts.  Id. at 700.  Thus, the D.C. Circuit struck the 2015 Order for "failing to satisfy the requirement of reasoned decisionmaking."  Id. at 703.

Since the ACA decision was issued, litigants throughout the country, and the parties in this case, have argued vehemently about whether and how ACA affects the definition of an autodialer.  Ramos argues that the ACA decision is not binding on this court.  The undersigned disagrees.  See Reyes, 2018 WL 2220417, at *11 (holding the ACA decision binding);  Dominguez v. Yahoo, Inc., 894 F.3d 116, 119 (3rd Cir. 2018) ("The decision in ACA International has narrowed the scope of this appeal.");  Ammons, 2018 WL 3134619, at *5, n.8  ("Although ACA International was decided by the D.C. Circuit, the decision is binding in this Circuit as well."); but see King, 894 F.3d 473 (denying binding authority of the ACA decision, but agreeing with the holding of the D.C. Circuit).

11

Pursuant to the Hobbs Act, 28 U.S.C. § 2342, federal courts of appeals have exclusive jurisdiction to invalidate FCC orders.  Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1113 (11th Cir. 2014).  "And when the FCC's regulations are challenged in more than one court of appeals, the panel on multidistrict litigation consolidates those petitions and assigns them to a single circuit.  See 28 U.S.C. § 2112."  Sessions v. Barclay Bank Delaware, 2018 WL 3134439, at *2 (N.D. Ga. Jun. 25, 2018) (citing Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc., 863 F.3d 460, 467 (6th Cir. 2017); Peck v. Cingular Wireless, LLC, 535 F.3d 1053, 1057 (9th Cir. 2008)).  The decisions in those consolidated appellate court actions are binding outside of the circuit in which they are rendered. Sessions, 2018 WL 3134439, at *2.  Thus, the undersigned concludes that the ACA decision is binding on this Court.

Hopele asks this Court to adopt an expansive view of the ACA decision; it argues that ACA also rejected the 2003, 2008, and 2012 FCC Orders. [DE 84, p.6].   The undersigned disagrees.  The ACA decision invalidated portions of the 2015 Order, but left intact the FCC's prior orders.  See Dominguez, 894 F.3d at 119 ("In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of [the] 2015 Declaratory Ruling"); Swaney v. Regions Bank, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018) (the ACA decision did not invalidate the 2003 FCC Rule that predictive dialers may still be autodialers even if they cannot be programmed to generate random or sequential numbers); Reyes, 2018 WL 2220417, at *11 ("Still, [defendant] reads too much into ACA International when it concludes that the prior FCC Orders can no longer be relied upon.").  Thus, the 2003 Rule that "the defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention'" remains in effect. Swaney, 2018 WL

12

2316452, at *1 (quoting 2003 FCC Order at 14092).   Since <u>ACA</u>, the courts have interpreted the statutory definition of an autodialer in accordance with the FCC's prior rules, that is, that a system is an autodialer if it has the present capacity to function as such. <u>Dominguez</u>, 894 F.3d at 119.  Latent or potential capacity to function as an autodialer does not satisfy the statute.[5]  <u>Id.</u>; <u>ACA</u>, 885 F.3d at 702.

To summarize, the undersigned concludes that the <u>ACA</u> decision is binding on this Court and, further, that the <u>ACA</u> decision invalidated the FCC's 2015 Order that a dialing system could be classified as an autodialer under the TCPA even if it possessed a latent or potential ability to dial numbers without human intervention.  The <u>ACA</u> decision does not affect the definition of an ATDS as set forth in the FCC's 2003, 2008, or 2012 Orders.

III.   DISCUSSION

In its motion for summary judgment, Hopele argues that the EZ-Texting program it utilized to send the text messages is not an automatic telephone dialing system as defined by the TCPA and subsequent FCC Orders because (1) it lacks the capacity to randomly or sequentially generate phone numbers, or, alternatively, (2) it could not send text messages without human intervention.[6]   Plaintiff counters that the EZ-Texting program

---

[5] Plaintiff's expert witness, Randall Snyder, has opined that the EZ-Texting system has the latent, or potential capability to function as an autodialer with the addition of "a few dozen lines of software code at most . . . ." [DE 83-1, p. 31].  Snyder also opines that the EZ-Texting system does not use human intervention to send texts.  Hopele and Pandora have moved to exclude Snyder's testimony as unreliable and as improper legal conclusions.  To the extent that Snyder's opinions are based upon the 2015 FCC Order or draw legal conclusions, they are disregarded.  <u>See</u> <u>Dominguez</u>, 894 F.3d at 120 (affirming exclusion of Snyder's report).

[6] Pandora has adopted Hopele's arguments on the issue of compliance with the TCPA [DE 94, n.2].

was, in fact, an automatic telephone dialing system as defined by the TCPA and subsequent FCC regulations because (1) it had the capacity to store telephone numbers and (2) it could dial those numbers automatically.

Hopele argues that recent case law establishes that to be an ATDS a system must have the capacity to generate and dial phone numbers randomly and sequentially and that the EZ-Texting system lacks that capacity.   The plain language of the TCPA appears to support Hopele's argument, although the FCC Orders do not.  See  Ammons, 2018 WL 3134619, at *4 ("Based on what appears at first blush to be unambiguous statutory language, § 227(a)(1) seems to dictate that the essential feature of an ATDS is that it uses 'a random or sequential number generator.'").  But,  "[a]s the [FCC] and federal courts have interpreted the term, autodialers include devices which automatically call numbers from a pre-programmed list, and 'predictive dialers,' which automatically call numbers from a list and automatically connect the calls with an available agent."  Pozo, 2016 WL 7851415, at *3.  Therefore, Hopele's argument "cannot be squared with the continuing validity of the 2003 FCC Order." Swaney, 2018 WL 2316452, at *2 (rejecting defendant's argument that to be an ATDS the equipment must have capacity to store or produce numbers using a random or sequential number generator).  Accordingly, the undersigned concludes that the definition of an ATDS, as interpreted by the FCC's 2003, 2008, and 2012 Orders  "'covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.'" Luna v. Shac, LLC, 122 F. Supp. 3d 936, 940 (N.D. Cal. 2015) (quoting FCC 2012 Order, at15399, n.5) (emphasis added).  Therefore, "the primary consideration . . . is whether human intervention is required at the point in time at

which the number is dialed." Id. (quoting Wilcox v. Green Tree Servicing, LLC, 2015 WL 2092671, at *5 (M.D. Fla. May 5, 2015); Ammons, 2018 WL 3134618, at *5; Reyes, 2018 WL 2220417, at *10-12; Legg v. Voice Media Group, Inc., 20 F.3d 1370, 1374 (S.D. Fla. 2014) (Cohn, J.) (explaining that the "defining characteristic" of an ATDS is "capacity to dial numbers without human intervention.").

The human intervention analysis is where Ramos' argument falters. Ramos argues that unless the human intervention occurs "at the point in time at which the number is dialed," see Strauss, 173 F. Supp. 3d at 1309, the equipment must be deemed an ATDS and that any level of human intervention prior to the point of actually dialing a number is immaterial. Clearly, compiling a list of numbers into a database does not remove a calling system from the definition of an ATDS. See Zeidel v. A&M (2015) LLC, 2017 WL 1178150, at *10 (N.D. Ill. Mar. 30, 2017) ("Courts have also rejected the argument that the amount of human intervention involved in merely entering a customer's telephone number[] into an electronic database removes the equipment from the definition of an ATDS.") (citations omitted). The FCC stated as much when it found that predictive dialers violate the TCPA. Thus, predictive dialers – those systems that use a pre-loaded list of phone numbers, calculate the optimal time to make a call, and make it at that time – fall within the definition of an ATDS. See Strauss, 173 F. Supp. 3d 1302 (granting summary judgment for calls made by a predictive dialer); Ammons, 2018 WL 3134619 (granting summary judgment on the issue that predictive dialer is an ATDS); Reyes, 2018 WL 2220417 (granting partial summary judgment finding that predictive dialer is an ATDS as a matter of law).

However, neither the case law nor the FCC Orders support Ramos' argument that a system is an ATDS unless the human intervention occurs at the exact moment that a text

is sent.   "What constitutes the amount of 'human intervention' required to take a device out of the category of an autodialer is a mixed question of fact and law."  Herrick v. GoDaddy.com LLC, 312 F. Supp. 3d 792 (D. Ariz. 2018).  The issue is to be determined on a case-by-case basis.  Blow v. Bijora, Inc., 191 F. Supp. 3d 780, 788-89 (N.D. Ill. 2016).  And a survey of case law establishes that  courts routinely determine as a matter of law the amount of human intervention necessary to establish whether a system is an ATDS.

In Jenkins, 2016 WL 4263937, the plaintiff received unsolicited marketing texts on behalf of a nightclub, Opera.  She filed suit under the TCPA, and both parties moved for summary judgment.  The court denied the plaintiff's motion but granted summary judgment on behalf of the defendants, finding "that human intervention discredits that a communication system is an ATDS."  Id. at *7.   Jenkins presented a factual scenario similar to that presented in the present case:

> It is undisputed that, to send promotional messages, an Opera employee had to: (i) navigate to a website; (ii) log into the Platform; (iii) determine the content of the text message; (iv) type the content of the text message into the Platform; (v) determine whether to send the test message immediately or to schedule a later date to send the message; (v) either click "send" to send the message immediately, or take an action to select a later date and time to send the message by using a drop-down calendar function.  Opera also determined the telephone numbers to which text messages were sent by an employee choosing a particular list of numbers and uploading the list to mGage's Platform as a CVS file.

Id. at *5-6.  The court noted that "direct human intervention [was] required to send each text message immediately or to select the time and date when, in the future, the text message will be sent."  Id. at *6.

16

The <u>Jenkins</u> court relied on an earlier case,  <u>Luna</u>, 122 F. Supp. 3d 936, in which

a California district court granted summary judgment for the defendant in a case <u>involving</u>

<u>the same EZ-Texing platform used by Hopele</u>.   The court there rejected the plaintiff's

argument that the human intervention was limited to uploading telephone numbers into the

system:

> Here, human intervention was involved in several stages of the
> process prior to Plaintiff's receipt of the text message,
> including transferring of the telephone number into the CallFire
> database, drafting the message, determining the timing of the
> message, and clicking 'send' on the website to transmit the
> message to Plaintiff.

<u>Id.</u> at 940.  The court specifically noted that the human intervention "was not limited to the

act of uploading the telephone number to the CallFire database, as Plaintiff argues."  <u>Id.</u>

at 941.  After finding specifically that "the subject text message was sent as a result of

human intervention," the court granted summary judgment in favor of the defendant.  <u>Id.</u>

at 941-42.

Likewise, in <u>Blow</u>, 191 F. Supp. 3d 780, the Illinois district court granted summary

judgment in favor of the defendant on facts very similar to the facts in the present case:

> Every single phone number entered into the messaging system
> was keyed via human involvement in one of two ways: either
> an Akira employee (or agent) would key the number into the
> platform, or the customer herself would send her phone
> number to the platform. . . .
>
> And the level of human involvement is not restricted to the
> keying of numbers into the software.  Once the user inputs the
> number into the messaging platform, the user must manually
> draft the message that the platform will send.  Then the user
> must specify whetyher to send the message immediately or at
> some specified time. . . . .  In short, the uncontested facts
> demonstrate that human involvement is required a nearly every
> step in the platform's text message transmission process.

17

Id. at 788. Notably, the <u>Blow</u> court distinguished the texting platform before it from a predictive dialer, and noted that a predictive "dialer <u>itself</u>, and not the user decides when to call." <u>Id.</u> (emphasis in original).   In contrast, in the platform at issue – like the EZ-Texting platform used by Hopele – "the user is in full control as to when to send the message." <u>Id.</u>  The court concluded that "[i]n short, the uncontested facts demonstrate that human involvement is required at nearly every step in the platform's text message transmission process."  <u>Id.</u>

Finally, in a post-<u>ACA</u> decision, a district court in Arizona granted summary judgment in favor of a defendant, finding that "the 'level of human agency involved in transmitting the text' amounts to essential human intervention that precludes defining the 3Seventy Platform as an ATDS."  <u>Herrick</u>, 2018 WL 2229131, at *10.  The process involved in the texting platform in that case was, again, remarkably similar to the process of the EZ-Texting system used by Hopele:

> First, an employee of GoDaddy provided 3Seventy with a list of customer phone numbers via its FTP site, which 3Seventy then uploaded to the Platform.  The employee then navigated to the website, logged onto 3Seventy's Platform, and selected the customer numbers it wished to send the text message. The employee then drafted the message and selected a time and date to send the message.  Finally, the employee entered a "captcha" – a device designed to ensure that a human, not a robot, was authorizing the desired message.  Only after the employee entered the captcha was the 3Seventy Platform able to send the message.

Id. at *9.  The totality of these human-directed actions led the court to conclude that the 3Seventy system was not an ATDS.

In the present case, the EZ-Texting system required almost identical human-directed actions as in <u>Jenkins</u>, <u>Luna</u>, <u>Herrick</u>, and <u>Blow</u>.  The EZ-Texting system cannot send a text without a person physically inputting numbers, drafting a message, selecting recipients, choosing a date and time to send the message, and manually hitting a "send" button. [DE 63, ¶ 9-13].  Hopele's manager, Pentacost, manually curated the list of customers who he wished to receive the marketing texts, scrubbed out landlines, drafted the text message, chose the date and time he wanted the message sent, and hit the "send" button. [DE 63, ¶7].   If Hopele had not ultimately pressed "send' to authorize the EZ-Texting platform to send the text message, nothing would have occurred and no text message would have been sent. [DE 63, ¶ 13-18]. These facts are undisputed.  The undersigned, therefore, concludes that the EZ-Texting system used by Hopele was not an ATDS.

The cases cited by Ramos are distinguishable in that the systems at issue in those cases did not require human intervention at the key steps in the process of making a call or sending a text message.  Many of the cases cited by Ramos involved predictive dialers, which the FCC has expressly ruled fit the definition of an ATDS.  <u>See</u>, <u>e.g.</u>, <u>Ammons</u>, 2018 WL 3134619 (summary judgment for plaintiff where predictive dialer dialed calls when it calculated that agents were available to take the calls); <u>Reyes</u>, 2018 WL 2220417, at *3 (summary judgment for plaintiff on ATDS issue for calls made with a predictive dialer); <u>Strauss</u>, 173 F. Supp. 3d 1302 (same);  <u>Lardner v. Diversified Consultants, Inc.</u>, 17 F. Supp. 3d 1215 (S.D. Fla. 2014) (same); <u>Sterk v. Path</u>, 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) ("The undisputed facts show that the equipment used by Path, which makes calls from a stored list without human intervention is comparable to the predictive dialers that

19

have been found by the FCC to constitute an ATDS."); <u>Cabrera v. Gov't Employees Ins. Co.</u>, 2014 WL 11881002 (S.D. Fla. Nov. 26, 2014) (denying defendant's motion for summary judgment for calls made by a LiveVox system previously held to be an ATDS).

Other cases cited by Ramos involved systems that lacked the level of human involvement required by the EZ-Texting system used by Hopele.  For example, in <u>Swaney</u>, the court determined that the system was an ATDS where it automatically sent balance alerts to customers by "determin[ing] if any of the accounts [were] registered to receive account balance alerts and whether the balance met the customer's threshold for triggering an alert. If the criteria was met, a message template for the alert was applied."  2016 WL 11372119, at *9.  The message was then automatically  placed in a file to be picked up by an aggregator, then delivered to a wireless carrier who delivered it to the customer's mobile device.  <u>Id.</u>  The entire process was automated.

Similarly, in <u>Zeidel</u>, the court denied the defendant's motion for summary judgment and stated that "a reasonable jury could conclude that the automatic timing function of" the system is "analogous to a predictive dialer."  2017 WL 178150, at *11.   In that case, the plaintiff complained about receiving a welcome text message from a retailer after making a purchase at the retailer's store.   Like a predictive dialer, the system itself determined when to send the message:

> Thus, it is undisputed that once Defendant's customers provided their contact information to an in-store sales associate and this information is entered into the electronic cash register, their contact information is 'automatically uploaded' into the customer database, 'automatically uploaded' into the Mozeo database, and them Mozeo immediately thereafter automatically sen[ds] a "welcome" message to the telephone number.

Id. at *9.   Again, unlike the system that Hopele utilized in this case,  there was no human involvement in inputting cell phone numbers, drafting the message, selecting recipients, choosing a date and time to send the message, or manually hitting a "send" button.

Finally, in Keim v. ADF Midatlantic LLC, 2015 WL 11713593, at *6 (S.D. Fla.  Nov. 9, 2015), Judge Marra denied the defendant's motion to dismiss, concluding that the complaint alleged an ATDS when "the only 'human intervention' involved [was] when a person input[] a friend's phone number into the content of a text message to Songwhale, whose own equipment then automatically store[d] the phone number in its database and later automatically sen[t] the text message to those stored numbers en masse."  Again, the level of human involvement in the entire process is what determines whether a system is an ATDS.

In contrast to the cases cited by Ramos, the undisputed facts establish that the EZ-Texting system could not send the text messages at issue without a significant amount of human involvement.

IV.    CONCLUSION

For reasons set forth above, the undersigned concludes that there is no genuine issue of material fact to prevent the Court from determining as a matter of law that the EZ-Texting system utilized by Hopele does not meet the definition of an autodialer under the TCPA.   Accordingly, the undersigned **RECOMMENDS** (1) that Hopele's Motion for Summary Judgment [DE 62] be **GRANTED**; (2) that Ramos' Motion for Summary Judgment [DE 68] be **DENIED**; (3) that Pandora's Motion for Summary Judgment [DE 19] be **DENIED AS MOOT**; (4) that Plaintiff's Motion for Class Certification [DE 61] be **DENIED**

**AS MOOT**; and that the Defendant's respective <u>Daubert</u> motions [DE 83 ] and [DE 99] be

**DENIED AS MOOT**; and that judgment be entered in favor of Defendants.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to file objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers, Fort Lauderdale, Florida, this 16th day of August 2018.

BARRY S. SELTZER
United States Magistrate Judge

Copies furnished via CM/ECF to:

Hon. Federico A. Moreno and
Counsel of record

22